## STATE v. CHARLES CHRISTIAN BAUER.

245 N. W. 2d 848.

August 20, 1976—No. 44075.

*C. Paul Jones*, State Public Defender, and *Rosalie Wahl*, Assistant State Public Defender, for appellant.

*Warren Spannaus*, Attorney General, *Gary W. Flakne*, County Attorney, and *Vernon E. Bergstrom*, *Michael McGlennen*, and *David W. Larson*, Assistant County Attorneys, for respondent.

YETKA, JUSTICE.

Defendant appeals his conviction in the St. Louis County District Court of murder in the second degree. He was indicted in Hennepin County District Court for first-degree murder in the shooting death of a Minneapolis police officer on February 4, 1972, but this court, on defendant's motion, ordered a change of venue to St. Louis County. On June 9, 1972, defendant was sentenced and committed to the custody of the commissioner of corrections for a maximum term of 40 years with a recommendation that he not be paroled. We reverse.

As to the evidence of the commission of the crime, there is little dispute. On January 27, 1972, a letter synopsizing the defendant's history of mental illness and stating that he was dangerous and in urgent need of treatment was sent to the United States Secret Service by Dr. Daniel Ferguson, M. D., of the Mental Health Clinic of the Veteran's Administration Hospital, where defendant had been undergoing psychiatric treatment. As a result, a petition for judicial commitment was granted and an order directing the Hennepin County sheriff to apprehend and confine the defendant for psychiatric examination was issued by the Hennepin County probate court.

On February 4, 1972, two deputy sheriffs in plain clothes and

two Minneapolis uniformed police officers went to the defendant's apartment in northeast Minneapolis to serve the commitment papers and to apprehend the defendant pursuant to the probate court order. After being denied admittance to the defendant's second story apartment, Officer Joseph Pudlick kicked in the door and entered along with one of the deputy sheriffs and the other police officer. The defendant fired three shots at them from inside the apartment, and while they retreated down the stairs, fired two additional shots, one of which killed Officer Pudlick. After tear gas capsules were shot into the apartment, the defendant surrendered.

At the defendant's arraignment in Hennepin County District Court, the court ordered a pre-plea psychiatric examination to determine the defendant's competency to stand trial.[1] He was initially screened by the court psychologist who, in a report to the court, concluded:

"In summary, Mr. Bauer's paranoid distrust is too great for him to share facts with anyone. He is adamant in his belief that others are not to be trusted, and that others will only pretend to help or defend him. This delusion is sufficiently generalized to include all of the legal profession, psychology, and psychiatry. He refuses to take medication that could alter his condition and make him more accessible. The question seems to be one of whether he is unwilling or unable to participate with counsel in

---

[1] The standard of competency at the time of these proceedings was set forth in Minn. St. 611.026: "No person shall be tried, sentenced, or punished for any crime while mentally ill or mentally deficient so as to be incapable of understanding the proceedings or making a defense * * *." For the current standard, see Rules of Criminal Procedure, Rule 20.01, subd. 1.

The United States Supreme Court has enunciated the following standard: "* * * [T]he 'test must be whether he [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'" Dusky v. United States, 362 U. S. 402, 80 S. Ct. 788, 789, 4 L. ed. 2d 824, 825 (1960).

the preparation and implementation of his defense. He will be evaluated in the near future by Dr. Carl P. Malmquist, consulting psychiatrist. Dr. Malmquist will address himself to the competency question."

During the course of his interview with Dr. Malmquist, the defendant was, as he had been with the court psychologist, generally uncooperative, refusing to discuss anything relating to the shooting or leading up to it. While concluding, on the basis of the information then available, that the defendant was merely unwilling to discuss the shooting, Dr. Malmquist in his report added the caveat that a more extensive psychological history and examination might reveal a delusional basis for defendant's uncooperative attitude which would render him incapable of participating in his defense. The defendant's past medical history was not available to Dr. Malmquist, apparently for the reason that the defendant refused to waive his medical privilege.

Following a second interview with the defendant, Dr. Malmquist concluded at a hearing on March 15, 1972, before Judge Crane Winton that the defendant was not incapable of cooperating in his defense, but only unwilling to do so and accordingly was competent to stand trial. On that basis Judge Winton ruled the defendant competent.

On April 20, 1972, more than a month after that competency hearing, Dr. Malmquist made a second report based on a third interview with the defendant, conducted at the defendant's request. The defendant was markedly more communicative during that interview about the details leading up to the shooting, although he still refused to discuss the actual events of the shooting. Dr. Malmquist did not *expressly* revise his prior opinion of competency, but concluded with the following:

"It is my impression that at this point Mr. Bauer is still insistent on wanting a trial to present his version of the events. *There is the danger of this individual having episodes where he may not be able to function adequately in court.* That is a very diffi-

cult thing to predict given the unknowns that can occur during the course of a trial. He again states that it is a matter of his not wishing to discuss further details with a lawyer. *At this time I could only offer the opinion that he may regress during a trial so that at those times procedures would be interfered with.* He does not view his state now as one of needing hospitalization, nor does he want it at this time. He is opposed now, as he was the first time I saw him, to medical, or legal, attempts to certify him as incompetent so that the story he wishes to present would not come forth. He is on no medications at this time to my knowledge. It will be a matter of assessing what degree of competency he must have, to not only cooperate with an attorney (which he does not wish to do), but to also conduct his own defense." (Italics supplied.)

During the pretrial hearings, the defendant repeatedly asserted his right to proceed pro se. As a result, Judge Winton appointed the public defender, apparently not to represent the defendant, but to act in the capacity of standby counsel,[2] offering assistance to the defendant only at his request.

The defendant filed an affidavit of prejudice against Judge Winton and by order by this court he was removed from the case.

The trial began May 30, 1972, before Hennepin County District Court Judge Bruce Stone. The defendant renewed his demand to proceed pro se, reiterating his belief that the public defender had been appointed to conceal his story of the shooting. Judge Stone, apparently because of the defendant's refusal to

---

[2] Judge Winton apparently followed the procedure set forth in the A. B. A. Standards for Criminal Justice, The Function of the Trial Judge (Approved Draft, 1972) § 6.7, which provides:

"6.7 Standby counsel for defendant representing himself.

"When a defendant has been permitted to proceed without the assistance of counsel, the trial judge should consider the appointment of standby counsel to assist the defendant when called upon and to call the judge's attention to matters favorable to the accused upon which the judge should rule on his own motion. Standby counsel should always be appointed in cases expected to be long or complicated or in which there are multiple defendants."

participate in the trial, allowed the public defender to conduct certain stages of the defense. But the defendant was also permitted to participate directly in his defense whenever he would assert his right to proceed pro se. A result, in part, of this dual representation was that no defense was offered on behalf of the defendant.

At the close of the prosecution's case, the public defender moved the court to suspend the trial for further inquiry into the defendant's competency to stand trial. The motion was denied.

The jury was instructed on murder in the first, second, and third degrees. The public defender's motion that there be an instruction on not guilty by reason of insanity was denied. The verdict of guilty of second-degree murder was returned on June 9, 1972. The public defender moved that the verdict be set aside and a new trial ordered on the basis of insufficiency of the evidence to support a verdict of murder in the second degree, because of prejudicial error committed during the course of the trial, and because during the latter part of the trial defendant had ceased to be able to participate in the conduct of his own defense. A separate motion was made that defendant not be sentenced because of his mental illness. All motions were denied and defendant was sentenced and committed to the custody of the commissioner of corrections for a maximum term of 40 years with a recommendation that he not be paroled.

The dispositive issue is whether the trial court failed to adequately protect the defendant's constitutional rights: (a) not to be tried or convicted while incompetent to stand trial; and (b) to the assistance of counsel. The issue is a narrow one. It is not whether the defendant was competent to stand trial or whether he was denied his right to counsel, but only whether the trial court, in fulfilling its protective duty, should have conducted further inquiry into these important matters.

## A. COMPETENCY TO STAND TRIAL

The public defender's motion for further psychiatric evaluation was made on the fourth day of the trial, June 7, 1972, at the

close of the state's case. The relief requested was that the court transfer the defendant to the State Security Hospital for a complete psychiatric and psychological examination to determine his competency to stand trial. The public defender advised the court, both in his capacity as court-appointed defense counsel and friend of the court,[3] that it was impossible for the defendant to act as his own counsel or to participate in his own defense through counsel. He credited this impossibility to two things: First, the defendant's paranoid distrust of anyone connected with the judicial system; and, second, his delusional thinking regarding a defense.[4] It was the latter ground that the public

[3] Judge Winton appointed the public defender in an advisory capacity both to the defendant and the court. In the latter capacity he was directed to (1) advise the court concerning the defendant's rights and interests throughout the criminal proceedings and (2) protect the public's interest in securing the defendant a fair trial.

[4] The defendant believed, and apparently could not be dissuaded from that belief, that the police had come to his home the afternoon of the shooting to arrest him for a housing violation and not to serve commitment papers on him. The defendant repeatedly throughout the course of the proceedings recounted what he considered purposeful "harassment" by government officials regarding housing code violations over the course of the preceding 5 years and said that the police action of February 4, 1972, was simply another chapter in that continuing saga. In the defendant's mind it was not he who was responsible for Officer Pudlick's death, but rather those who subjected him to "continued harassment." His "defense" is summed up in the close of his final argument:

"The people who are responsible for his death and tragedy and malicious harassment of me are not on trial here * * *.

"The people who charge the law in my case have the freedom and are illegally using the law to cover up an illegal break-in in this case with lying and fraudulent commitment petition to make it legal. I have a perfect record of no crime and no violence and this case will show you how the law has twisted to suit private reasons and it ends up in ruining this record and agitating the death of this law officer.

"This officer has died because of malicious and illegal use of power of law to cover it up because—he has died because of a continuous and malicious harassment on me and pre-existing emotional disorder of

defender believed was the most serious, for it prevented the defendant from availing himself of the one good defense he had—not guilty by reason of insanity.[5]

mine. That was continually attacking and irritating to a climax of emotional explosion and it could have been my death here or others and a much more tragic incident.

"This man has died because I could get no relief or redress to stop this malicious harassment from the killing of my health, my spirit and soul from lawyers, doctors, people, representatives, the Civil Liberties Union and the Federal Court because of a conflict of interest from the judge of that court.

\* \* \* \* \*

"This investigation is gone to other government offices that have harassed me before and spread my story around and stimulating the spark of someone's malicious and twisted emotional nature to the start of a final harassment of me by sending me a housing violation letter on January 18th that resulted in this man's death and tragedy."

As the public defender advised the court, the defendant's "defense" was one which could not "legally be prepared and presented in this court so as to make it admissible." It was because of defendant's inability to secure "relief or redress" that he would not cooperate with the public defender, the court psychologist, Dr. Malmquist and ultimately, the trial court.

[5] The test of competency (see footnote 1, *supra*) is two-pronged, and it is only the second aspect—the ability to make a defense—which was in doubt. It is evident from the record that the defendant knew the nature of the crime with which he was charged and the extent of the penalty, and understood the nature of the proceedings. Much of his participation in the trial reveals an understanding and familiarity with legal proceedings exceeding that of the average layman. But interspersed with that is his lack of any rational understanding of his defense. Illustrative of this dichotomous behavior are his suggested voir dire questions:

"THE COURT: Any question that you want to ask them I have to know first, Mr. Bauer.

"THE DEFENDANT: Well, do you believe the law is ever unjust or makes mistakes? Have you ever seen the real person under stress or strain or crack-up under stress or strain? Do you believe someone should be forced to come to trial unprepared? Do you believe someone should be forced to take a lawyer he doesn't want? What are your

In support of his motion, the public defender offered the testimony of Dr. Carl Swartz, a psychiatrist experienced in render-

rights as a citizen under the Constitution? Should police officers follow the law? Should a judge have a temper? Can a judge unfairly instruct the jury? Example, how? If a judge tells you that if the law is broke you must find them guilty, how would you find? Whose evidence would you believe if three people say one thing and one person says the opposite thing? What should be done with alcoholics? What should be done with a person on drugs?

"What do you think of a bad conduct Army discharge on a person on drugs? How is your memory? What things are you afraid of? Do you have a temper? What things get on your nerves? How is your health? Do you want some more?

"THE COURT:  I'm writing them down. It's whether you want some more, Mr. Bauer.

"THE DEFENDANT:  How should criminals be punished? What is the most famous trial you know of? What is the most unfair trial you know of? Would you give more weight to a law officer's oral testimony than to a private citizen? What is your opinion of a mother who kills her baby or children? What would you do with her? Who is at fault for the death of the children? What are your views on executing a person for the crime of murder? What conditions make a criminal? What conditions make crime?

"Describe a case on how a criminal is made. Whose fault is it that there is a lot of crime? What conditions do you see that should be corrected that make crime? What do you think of the many accusations of police brutality? Do you believe the policemen will deliberately lie under oath? Are people mistreated in jail? How should criminals be punished? What is a judge's duty in a trial? Does this system respond to grievances or complaints of the people? Should the law be general or specific? What are your rights as to trial? If you found a person broke the law and this law he broke was morally wrong, what would you do?

"If the judge said you must find him guilty, how would you find? In what ways can a person be attacked beside in a physical way? What is your opinion of how much people deliberately lie in court to gain some advantage or protect themselves or someone from trouble? Are all people born equal? For what reasons do you wish certain individual rights from government? What would continuous noise do to a nervous person?

ing competency opinions both for the prosecution and defense. Dr. Swartz testifed that on the basis of Dr. Malmquist's reports, the court psychologist's report, Dr. Ferguson's letter to the Secret Service, and his own observation of the defendant's behavior during a day and a half of trial, the defendant was, by statutory definition, incompetent to stand trial. He added that it would be "clinically mandatory" for the defendant to have a "battery of psychological tests" in order to determine the extent of his thinking disorder. Questioned as to the defendant's past and present refusal to cooperate in any testing, Dr. Swartz stated that that was a classical reaction of a paranoidally psychotic individual, the diagnosis he rendered regarding the defendant's mental condition.

The motion was denied on the grounds that (1) the defendant had previously been found to be competent to stand trial by Dr. Malmquist and order of Judge Winton, and (2) the defendant's expressed unwillingness to submit to further examination. Judge Stone, apparently relying on Minn. St. 611.025,[6] placed on the defense the burden of establishing that a change of circumstances had occurred since Judge Winton's order which would warrant a suspension of the trial and further psychiatric evaluation. Judge Stone did indicate that the matter might be considered further when the mental illness defense was submitted.

----

"What would constant questioning do to a person? What effect does improper sleep have on a person? What rights does a prisoner in jail have? What conditions would you see that a jail would have for prisoners?

"They all generally run about the same as that."

Some of these questions defendant proposed are strategic and frequently asked by experienced defense counsel; others, however, relate only to what defendant believed justified his shooting Officer Pudlick and were wholly irrelevant to any legal defense.

[6] Minn. St. 611.025 provides: "[E]xcept as otherwise provided by law, in every criminal proceeding, a person is presumed to be responsible for his acts and the burden of rebutting such presumption is upon him."

Later that same day, after it appeared that no defense would be entered because of the defendant's refusal to waive his medical privilege, the public defender renewed his motion, amending it to a request for a half-day suspension of the trial in order for Dr. Malmquist and Dr. Swartz to further examine the defendant together and report their findings and opinions to the court subject to examination by counsel. In denying that motion, Judge Stone concluded:

"Well, obviously, this is not an easy situation, gentlemen. I know you both appreciate it. I should state also for the record that I, obviously, would have preferred if Dr. Malmquist's report and opinion were more exact on a kind of yes or no basis but I've been over this and that is a determination that was made in our court by another judge soon before trial and I've seen nothing that has happened here since that time.

"I think Mr. Bauer's remarks, his questions and so forth, show that irrespective of his mental state he has sufficient competency to cooperate in the defense if he wants to. It's apparent that he does not want to."

Dr. Malmquist was in attendance at the trial the following morning, June 8, 1972. The public defender advised the court of Dr. Malmquist's presence and his intention to call Dr. Malmquist on the issue of the defendant's present competency. Judge Stone reiterated his prior ruling regarding further inquiry into the defendant's competency:

"THE COURT: Well, gentlemen, as you know, I've ruled that Judge Winton's order is the law of the case insofar as competency is concerned. It was based, as I am informed, on Dr. Malmquist's report, his own observations, Judge Winton's observations, the presumption of responsibility not having been overcome and there's nothing here that I am prepared to rule to the contrary by any matter or means. The ruling of the Court is that Mr. Bauer is competent to stand trial and he is competent to determine what witnesses he desires to have called in his behalf, if any."

Subsequently the public defender interviewed Dr. Malmquist and was told that he was unable to render an opinion regarding the defendant's present competency to stand trial for the reason that he had not had the opportunity to view the defendant's behavior in the courtroom. The public defender so advised the court.

The controlling authorities are the United States Supreme Court decisions in Drope v. Missouri, 420 U. S. 162, 95 S. Ct. 896, 43 L. ed. 2d 103 (1975), and Pate v. Robinson, 383 U. S. 375, 86 S. Ct. 836, 15 L. ed. 2d 815 (1966), and our decision in State v. Jensen, 278 Minn. 212, 153 N. W. 2d 339 (1967). While these decisions fall short of providing complete guidance in resolving the specific problem with which we are confronted, their underlying rationale, which *is* readily discernible, commands the result we reach.

The essence of the authorities cited is that throughout the course of criminal proceedings a trial judge must be vigilant in ensuring that the defendant is competent to stand trial and that, when a sufficient doubt of the defendant's competence arises, he must observe procedures adequate to ensure the defendant's competency. In Drope, the United States Supreme Court stated:

"It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial.

\* \* \* \* \*

"In *Pate v. Robinson* [citation omitted] we held that the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." 420 U. S. 171, 95 S. Ct. 903, 43 L. ed. 2d 112.[7]

---

[7] We have said that Minn. St. 611.026 imposes a "duty" upon the trial judge to refrain from trying a defendant who is incompetent to stand trial. State v. Jensen, 278 Minn. 212, 217, 153 N. W. 2d 339, 342 (1967);

What minimum procedure or inquiry is constitutionally mandatory is a question not answered in the cited decisions, but it is a question we need not reach in the instant case. We need only observe here that no further inquiry was made by the trial court because he determined that there was not sufficient doubt of the defendant's competency to stand trial to require further inquiry.[8] Accordingly, the question upon which we focus is whether the record discloses sufficient doubt.

State ex rel. Christopherson v. Rigg, 258 Minn. 229, 103 N. W. 2d 367 (1960); State ex rel. Novak v. Utecht, 203 Minn. 448, 281 N. W. 775 (1938).

[8] The state advances the argument that by taking the testimony of Dr. Swartz, offered in support of the public defender's motion for a suspension of the trial for further psychiatric evaluation, the trial court observed procedures adequate to ensure the defendant's continued competency to stand trial, and that our review should accordingly focus on whether the trial court correctly determined that the defendant was competent. We are unwilling to engage in such sleight of hand. Dr. Swartz's testimony was offered by the public defender solely for the purpose of establishing the need for further inquiry into the defendant's continued competency to stand trial, and not to establish his incompetency. The two determinations are wholly different, the former involving only the question of whether there is a "sufficient doubt" of competency. It was that question which was before the trial court and which he ruled on.

Moreover, assuming arguendo that we were to regard the hearing as a further procedure, it is highly doubtful that the procedure would be adequate. In Dusky v. United States, 271 F. 2d 385 (8 Cir. 1959), the court upheld a finding of competency based on two psychiatric reports and the testimony of an examining psychiatrist, all of which concluded that the defendant was not competent. The testimony of the psychiatrist, however, was apparently somewhat ambiguous. The Court of Appeals concluded that the trial court was free to reject the expert testimony if it was not credible. The United States Supreme Court granted review and in a per curiam opinion concluded: "Upon consideration of the entire record we agree with the Solicitor General that 'the record in this case does not sufficiently support the findings of competency to stand trial,' for to support those findings under 18 U. S. C. § 4244 [statutory authority requiring competency hearing] the district judge

The United States Supreme Court has purposefully avoided prescribing "a general standard with respect to the nature or quantum of evidence necessary to require resort to an adequate procedure," Drope v. Missouri, 420 U. S. 162, 172, 95 S. Ct. 896, 904, 43 L. ed. 2d 103, 113 (1975), applying instead an ad hoc review of the cases coming before it. The court does suggest, however, factors to be considered.

"The import of our decision in *Pate v. Robinson* is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." 420 U. S. 180, 95 S. Ct. 908, 43 L. ed. 2d 118.

Before turning to a consideration of the circumstances of the instant case, it is necessary to say a few words about the scope of our review. What is involved here is the alleged denial of constitutional rights of due process and fair trial. While the issue is cast in the form of a factual determination, we are not permitted to accord it the usual deference given to a trial court's findings. In Drope, the respondents advanced the argument that the appellate-review function should be limited "to a determination of whether the findings, conclusions and judgment of the trial court [were] clearly erroneous." 420 U. S. 174, 95 S. Ct.

---

'would need more information than this record presents.'" 362 U. S. 402, 80 S. Ct. 788, 4 L. ed. 2d 824, 825 (1960).

In the instant case the only expert opinion regarding the defendant's competency to stand trial at the time the motion was made was that he was incompetent. It is not clear to us that the trial court was free to disregard that testimony without further expert opinion.

905, 43 L. ed. 2d 114. In rejecting that standard, the United States Supreme Court stated:

"In the present case there is no dispute as to the evidence possibly relevant to petitioner's mental condition that was before the trial court prior to trial and thereafter. Rather, the dispute concerns the inferences that were to be drawn from the undisputed evidence and whether, in light of what was then known, the failure to make further inquiry into petitioner's competence to stand trial, denied him a fair trial. In such circumstances we believe it is 'incumbent upon us to analyze the facts in order that the appropriate enforcement of the federal right may be assured.' Norris v. Alabama, 294 U. S. 587, 590 (1935)." 420 U. S. 174, 95 S. Ct. 905, 43 L. ed. 2d 115.

Ultimately the court concluded in Drope that "the record reveals a failure to give proper weight to the information suggesting incompetence which came to light during trial." 420 U. S. 179, 95 S. Ct. 907, 43 L. ed. 2d 117.

Here, too, there is no dispute as to the evidence possibly relevant to defendant's mental condition that was before the trial court. We therefore review the record to determine whether he gave "proper weight to the information suggesting incompetence" in concluding that there was not sufficient doubt of the defendant's fitness to stand trial so as to require further inquiry.

The trial court, in denying the public defender's motion for further psychiatric evaluation, relied on (1) Judge Winton's prior finding of competency; (2) the trial court's observation of the defendant's demeanor throughout 6 days of trial; (3) the defendant's expressed unwillingness to submit to further examination; and (4) with regard to the motion, the trial court's misplaced reliance on Minn. St. 611.025 to impose the burden upon the defense. Apparently, little weight was given to what we believe was substantial information suggesting incompetence: Dr. Swartz's opinion that the defendant was presently incompetent to stand trial; Dr. Malmquist's opinion on April 20 that the de-

fendant might regress during trial so as to be unable to function adequately; and the public defender's belief that the defendant was incompetent.

We recognize that the trial court could properly consider the prior finding of competence, based as it was on Dr. Malmquist's medical opinion, and also his observations of the defendant's demeanor in the courtroom. And admittedly there is some degree of persuasiveness in the trial court's reasoning that if the defendant's behavior during trial was consistent with his behavior during the pretrial hearings before Judge Winton, especially at the time of the prior finding of competence, there was little reason to doubt his present fitness for trial. However, the prior finding of competence and the defendant's demeanor during trial, while properly considered, cannot foreclose further inquiry in the face of "uncontradicted testimony" suggesting incompetence, Drope v. Missouri, 420 U. S. 162, 179, 95 S. Ct. 896, 907, 43 L. ed. 2d 103, 117 (1975); Pate v. Robinson, 383 U. S. 375, 385, 86 S. Ct. 836, 842, 15 L. ed. 2d 815, 822 (1966); State v. Jensen, 278 Minn. 212, 215, 153 N. W. 2d 339, 341 (1967).[9] Here, in addition to Dr. Malmquist's caveat that the defendant might regress during trial and the public defender's opinion that the defendant was incompetent, the trial court had before it the unequivocal and uncontradicted opinion of Dr. Swartz, a psychiatrist experienced in rendering competency opinions, that the defendant was mentally unfit to stand trial.

The United States Court of Appeals for the District of Columbia Circuit, under similar circumstances, reversed a conviction

[9] Drope recognizes the possibly transient nature of an individual's competency and impliedly rejects reliance on prior findings of competency to foreclose further inquiry in light of present evidence suggesting incompetency. As therein stated: "Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." Drope v. Missouri, 420 U. S. 162, 181, 95 S. Ct. 896, 908, 43 L. ed. 2d 103, 119 (1975).

based on the trial court's failure to conduct further inquiry sua sponte into the defendant's competency to stand trial when it came to his attention that the defendant was using narcotics during the course of the trial. The appellate court rejected the trial court's reliance on his observations of the defendant and a prior finding of competency in light of uncontradicted testimony that the defendant's use of narcotics impaired his intellectual functions.

"The trial judge in this case, having observed appellant, may have thought him competent. But it plainly appears from Pate v. Robinson that appellant's apparent alertness and understanding during trial cannot wipe out the uncontradicted testimony that his memory and other intellectual functions became severely impaired when he was under the influence of narcotics. While his demeanor at trial may be a relevant factor, it is by no means the only one and it cannot obviate the need for a hearing on his competence. This reasoning applies with particular force to a defendant who may be under the influence of narcotics, since the symptoms and effects of an acute brain syndrome produced by narcotics will often not be apparent to a lay observer, even a judge, but only to an expert. Even then a careful examination would seem necessary to determine the extent to which the defendant's memory and other rational faculties have been impaired by the drugs.

"Nor can the District Court's previous determination of competency relieve the trial court of its constitutional duty to conduct an inquiry at the time of the trial. In Pouncey v. United States, the defendant had been found competent by the District Court following examination at Saint Elizabeths Hospital, but his behavior at trial cast doubt on that finding. We there stated that

[A] judge's responsibility to guard against the possibility that an accused person may have become incompetent does not end when the trial begins. A hospital report is only a prediction that when the accused is tried he will be able to participate adequate-

ly in the proceedings. Later developments may throw doubt on the prediction, particularly when, as in this case, the report does not show the hospital's understanding of 'competence', the tests it employed, or the certainty of its diagnosis.

We therefore held that, despite the earlier finding of competency, the trial court had erred by failing to inquire further at the time of the trial." Hansford v. United States, 124 App. D. C. 387, 391, 365 F. 2d 920, 924 (1966).[10]

We find this reasoning persuasive.[11]

The defendant's refusal to cooperate in further psychiatric evaluation certainly presents the most troublesome problem. However, we cannot agree that such refusal, if the result of men-

_____

[10] See, also, Rose v. United States, 513 F. 2d 1251 (8 Cir. 1975), where the court rejected the Federal trial court's reliance, in part, on an adjudication of competency 2 months earlier in a state court. In a footnote the court stated: (513 F. 2d 1257) "Why the prior adjudication cannot be treated as absolutely foreclosing subsequent competency inquiries is obvious: the competency of an accused cannot be rendered an immutable historical fact, for the mental condition of an accused may change drastically in a matter of months. 'Section 4244 deals with a class of potentially unbalanced defendants whose condition can fluctuate widely—from aggravation to remission—over relatively short time spans.' United States v. Taylor [437 F. 2d 371, 382 (4 Cir. 1971)] (Sobeloff, J., concurring and dissenting)."

[11] Moreover, in the case before us, the prior finding, coupled with the trial court's observations, is not as persuasive as it might at first seem. Judge Winton's ruling was based principally on Dr. Malmquist's March 3, 1972, report and his testimony of March 15, 1972, in which he rendered the opinion the defendant was competent to stand trial. It was not based on substantial observations by him of the defendant's behavior. While Dr. Malmquist presumably relied on the defendant's behavior, his observations were limited to two brief interviews. Furthermore, because the defendant refused during both interviews to discuss anything relating to the shooting, Dr. Malmquist did not witness the defendant's recounting of what he believed led to Officer Pudlick's death. When he finally did witness this, he advised the court that the defendant might regress during trial to such an extent that he would not be able to function adequately.

tal disorder, can deny him his constitutional rights of due process and fair trial. In State v. Jensen, 278 Minn. 212, 216, 153 N. W. 2d 339, 342 (1967), quoting from Pate v. Robinson, 383 U. S. 375, 384, 86 S. Ct. 836, 841, 15 L. ed. 2d 815, 821 (1966), we recognized: "[I]t is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." For that reason we rejected the state's argument that the defendant, by waiting to raise the issue of his competency until after the conclusion of the trial, had waived his right to have further inquiry made. We think it is equally "contradictory" to deny further inquiry based on a "classic symptom" of a paranoidally psychotic individual, the refusal to cooperate. Moreover, the public defender's amended request merely sought a half-day continuance of the trial to allow Dr. Malmquist to observe the defendant, which presumably would not have required the defendant's cooperation. But even assuming that nothing further could have come from additional psychiatric evaluation, that does not allay the doubt of the defendant's competence to stand trial.

Finally, the trial court was clearly in error in placing the burden of persuasion on the defense for establishing sufficient doubt to require further inquiry. First, we note that the statutory provision the trial court relied on, Minn. St. 611.025, does not raise a presumption of competence to stand trial, but only responsibility for the criminal act. Second, it appears clear enough from the cited cases that neither party to a criminal proceeding bears any burden with respect to that issue. Rather, it is the function of the court, on its own motion or the motion of either party, to determine whether there is a sufficient doubt of the defendant's competency to require further inquiry with neither side of the question favored by any presumption.

In our view, the significant evidence before the trial court relevant to the defendant's mental condition was (1) the public defender's judgment as friend of the court that the defendant was incapable of participating in or making a legal defense, (2) Dr.

Malmquist's cautionary opinion of April 20, 1972 that the defendant might regress and be unable to function adequately, and (3) Dr. Swartz's medical opinion that the defendant was paranoidally psychotic, rendering him incapable of standing trial. We believe that the trial court gave that evidence of incompetency too little weight. Had it been given proper consideration, we are convinced that the constitutionally required procedure would have been to suspend the trial and conduct further inquiry.[12]

### B. COMPETENCY TO WAIVE COUNSEL

The defendant, throughout all the proceedings, insisted on representing himself and repeatedly voiced his intention not to cooperate with court-appointed counsel. While a defendant in a state criminal trial is certainly entitled to proceed pro se, a condition of that right is a knowing and intelligent waiver of the corresponding right to the assistance of counsel. Faretta v. California, 422 U. S. 806, 95 S. Ct. 2525, 45 L. ed. 2d 562 (1975); cf. State v. Huber, 275 Minn. 475, 148 N. W. 2d 137 (1967). The responsibility for assuring an adequate waiver rests with the trial court.

"* * * Although petitioner received a hearing on the issue of his competence to stand trial, there appears to have been no hearing or inquiry into the issue of his competence to waive his constitutional right to the assistance of counsel and proceed, as he did, to conduct his own defense. 'The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused—whose life or liberty is at stake—is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent

---

[12] In fairness to the trial court, we observe that it did not have the benefit of the United States Supreme Court's decision in Drope v. Missouri, 420 U. S. 162, 95 S. Ct. 896, 43 L. ed. 2d 103 (1975), which further developed and illuminated those principles first enunciated in Pate v. Robinson, 383 U. S. 375, 86 S. Ct. 836, 15 L. ed. 2d 815 (1966).

waiver by the accused.' *Johnson v. Zerbst*, 304 U. S. 458, 465.; *Carnley v. Cochran*, 369 U. S. 506." Westbrook v. Arizona, 384 U. S. 150, 86 S. Ct. 1320, 16 L. ed. 2d 429, 430 (1966).[18]

Implied in the court's decision is the suggestion made in Massey v. Moore, 348 U. S. 105, 108, 75 S. Ct. 145, 147, 99 L. ed. 2d 135, 138 (1954):

"* * * One might not be insane in the sense of being incapable of standing trial and yet lack the capacity to stand trial without benefit of counsel."

To summarize, when the mental competency of the defendant comes into question, it is incumbent on the trial court, independent of the issue of competency to stand trial, to conduct further hearings or inquiries into the competency of the defendant to make a knowing and intelligent waiver of his right to the assistance of counsel before permitting the defendant to proceed pro se. An examination of the record here discloses a failure to do so.

All of the inquiry into the defendant's mental competency was directed at a determination of whether the defendant was competent to stand trial. No expert opinion was sought or given with regard to the defendant's competence to make an adequate waiver of his right to counsel. On one occasion during the course of the trial, the public defender raised the issue, distinguishing it from competence to stand trial. However, the trial court, in continuing to allow the defendant to represent himself, appeared to rely on Dr. Malmquist's March 15, 1972, opinion that the defendant was competent to stand trial.

While we recognize that the defendant was fully informed and advised, on repeated occasions, of his right to counsel and of the disadvantages that would flow from waiving that right, we nevertheless believe that had the trial court given the required

[18] Competence as used here does not refer to *legal* ability but rather the *mental* ability to make the waiver. Faretta v. California, 422 U. S. 806, 835, 95 S. Ct. 2525, 2541, 45 L. ed. 2d 562, 581 (1975).

consideration to whether defendant was competent to waive the right, the defendant might not have been permitted to proceed pro se.

First, the defendant's reason for wishing to dispense with defense counsel was his paranoid distrust of everyone connected with the judicial system. Not only did the defendant repeatedly express this distrust, but it was also documented by the court psychiatrist and psychologist. The defendant reiterated his distrust before Judge Stone at the outset of the trial:

"THE DEFENDANT: I'd like to repeat for the record again that, as I have before, that William Kennedy, the Court-appointed Public Defender, is not my attorney and I will handle my own case. I have not hired him or worked with him and I object to him being appointed for me by the Court against my will * * *.

\* \* \* \* \*

"* * * [T]he law and judges and lawyers have been illegally used against me to maliciously prosecute me and harass my health until my health broke and tragedy and crime happened.

"Now fellow brother lawyers and judges will be protecting these judges and lawyers who harassed me and this will be at the sacrifice of my rights and in protection and a cover-up from the real causes of this homicide.

\* \* \* \* \*

"Then counsel is forced on me which will not bring out the whole truth and will cover up and leave out evidence of the real cause of this homicide in protection of fellow members of his profession * * *."

Second, the charges against the defendant were the most serious that can be made in Minnesota, murder in the first degree. The penalty is life imprisonment, the most severe imposed in this state. And his only defense of merit was a very complicated one —not guilty by reason of insanity—requiring expert testimony and involving complicated evidentiary rules.

Third, the justification which the defendant consistently of-

fered in his defense throughout the proceedings—harassment by government officials and his delusional belief that the police officers had come to incarcerate him for housing violations—was both irrational and not a legal defense.

We believe the A. B. A. Standards for Criminal Justice, The Function of the Trial Judge (Approved Draft, 1972) §§ 6.6 and 6.7, set forth the proper procedure to be followed. Standard 6.6, entitled, "The defendant's election to represent himself at trial," provides:

"A defendant should be permitted at his election to proceed in the trial of his case without the assistance of counsel only after the trial judge makes thorough inquiry and is satisfied that he

(i)   has been clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel when he is so entitled;

(ii)   possesses the intelligence and capacity to appreciate the consequences of his decision; and

(iii)   comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case."

The commentary to that section provides that the trial judge should also comply with § 7.2 of the A. B. A. Standards for Criminal Justice, Providing Defense Services (Approved Draft, 1968), which provides:

"The accused's failure to request counsel * * * should not of itself be construed to constitute a waiver. An accused should not be deemed to have waived the assistance of counsel until the entire process of offering counsel has been completed and a thorough inquiry into the accused's comprehension of that offer and his capacity to make the choice intelligently and understandingly has been made. No waiver should be found to have been made where it appears that the accused is unable to make an intelligent and understanding choice because of his mental condi-

tion, age, education, experience, the nature of the complexity of the case, or other factors."

Also in the commentary, and of particular significance in this case, is the suggestion that a defendant's paranoid distrust of appointed counsel should not outweigh the public interest in securing the defendant a just and orderly trial.

In conclusion, let us stress that we are not unmindful of the heinous nature of the crime with which the defendant was charged and of which he stands convicted. The circumstances of this case are all the more aggravated when we stop to consider that the victim was a police officer executing the process of our courts. But neither those courts nor the public profit when a defendant, unable to make or participate in a defense because of a mental disorder, is tried and convicted. While we are mindful of the seriousness of our task, we are also mindful of the admonition of the United States Supreme Court in Drope v. Missouri, 420 U. S. 162, 172, 95 S. Ct. 896, 904, 43 L. ed. 2d 103, 113 (1975), that "the prohibition [against trying a mentally incompetent defendant] is fundamental to an adversary system of justice."

We do not say that defendant is not in need of custodial care. On the contrary, all the facts clearly indicate that he is in need of such care. But if one is mentally incapacitated, his custody should encompass medical and psychiatric care in a state mental hospital, not in a prison. A prison atmosphere can hardly be considered ideal for such care. Moreover, sooner or later a prisoner may be released from prison. Without treatment, the public could be endangered by such release.

We therefore remand the matter to the district court with directions to set aside the judgment of conviction and grant a new trial.

Reversed and remanded for a new trial.

MR. JUSTICE SCOTT took no part in the consideration or decision of this case.