**STATE of Minnesota, Respondent,**

v.

**Eric Warren HULIN, Appellant.**

**No. C6–87–91.**

Court of Appeals of Minnesota.

Sept. 22, 1987.

Review Denied Nov. 13, 1987.

Hubert H. Humphrey, III, Atty. Gen., Robert A. Stanich, Sp. Asst. Atty. Gen., St. Paul, John R. Leitner, Aitkin Co. Atty., Aitkin, for respondent.

Jonathan G. Steinberg, Chrastil & Steinberg, Minneapolis, for appellant.

Considered and decided by FOLEY, P.J., and PARKER and SEDGWICK, JJ., with oral argument waived.

## OPINION

PARKER, Judge.

Appellant Eric Hulin appeals from judgments of conviction and sentences for six counts of attempted first-degree murder and one count of possession of a short-barrelled shotgun, *see* Minn.Stat. § 609.67, subds. 1 and 2 (1986). Hulin was charged with 12 counts of attempted murder against six peace officers. *See* Minn.Stat. § 609.185(1) (premeditated murder) and (4) (1986) (causing death of a peace officer); Minn.Stat. § 609.17 (1986) (attempts). A jury found him guilty of 11 counts. Five convictions were vacated under Minn.Stat. § 609.035 (1986). Hulin attempted suicide by hanging shortly before he was to be sentenced and suffered organic brain damage. Following several competency examinations, *see* Minn.R.Crim.P. 20.01, he was found competent to be sentenced. He was sentenced to consecutive sentences on all but one count, reaching an aggregate sentence of 544 months reduced to 480 months under Minn.Stat. § 609.15, subd. 2 (1986). We affirm.

## FACTS

Eric Hulin was involved in a shootout with Aitkin County Sheriff's Office personnel and Aitkin police officers on the night of December 7, 1984, at the Hulin residence north of that city. Sheriff's deputies had arrived at the house at 11:45 p.m. to execute a search warrant obtained following a statement from an informant indicating that Hulin would be there in possession of a large quantity of weapons. Hulin's mother, Charlotte Hulin, was home and while officers explained the warrant to her, they heard noises in the basement. Officer Harold Lucht proceeded to the basement, where he was shot in the side. More shots were fired from the basement through the kitchen floor, hitting a number of deputies, who returned fire.

Police were able to flush Hulin and a friend, Terry Stafford, out of the basement with tear gas. Hulin was shot in the leg. He was found with a sawed-off shotgun within arm's reach and a bandolier containing shotgun shells around his chest. When they searched the basement police found numerous weapons, including additional firearms and expended shells.

Hulin was examined to determine his competency to stand trial. *See* Minn.R. Crim.P. 20.01. He stated he could not recall the shooting incident. He was found competent to stand trial. Hulin did not testify, but presented a defense of intoxication, claiming he was high on LSD and marijuana the night of the shootout.

Hulin sought to keep references to his prior felony record out of other witnesses' testimony. Todd Janke, an acquaintance of Hulin's from St. Cloud Reformatory, was called by the state to testify to what Hulin had threatened to do if police ever attempted to arrest him. Before testifying, Janke was taken into chambers and encouraged to exclude any reference to Hulin's prior incarceration. The prosecutor agreed that Janke's testimony would not include Hulin's statement that he would "rather die before they could take him back to prison." He then questioned him as follows:

Q: And what did Eric Hulin say in regard to what he would do if the police tried to arrest him?

A: That he would-would-would resist if they came into his house and if, you know, if they came to take him away he would resist arrest.

Q: Isn't it true that he said that he would fight and he would rather die before they took him back to prison?

A: Yes, I think.

Hulin moved for a mistrial, which was denied.

Similar reference to Hulin's imprisonment was excised from the testimony of Janke's wife. Another witness, however, Keith Robertson, was questioned by the prosecutor on whether Hulin had "said he'd rather die than go back to jail." Hulin then renewed his motion for a mistrial. The trial court denied the motion on the grounds that defense counsel had opened the door to the reference on cross-examination.

The trial court considered instructing the jury on the offenses of second-degree assault (with a dangerous weapon), *see* Minn. Stat. § 609.222 (1986), and reckless handling of a dangerous weapon, *see* Minn. Stat. § 609.66, subd. 1 (1986). The court gave Hulin the choice of having both offenses submitted to the jury, or neither, declining to allow Hulin to have only the reckless handling charge submitted. Hulin chose to have neither of these offenses submitted. The jury found him guilty of 11 counts of attempted first-degree murder and one count of possession of a short-barrelled shotgun.

On August 10, 1985, two days before the scheduled sentencing, Hulin tried to hang himself in the county jail. He was found in a comatose state and rushed to a Duluth hospital. In the months following, five psychiatrists and psychologists examined Hulin to determine whether he was competent to be sentenced. Hulin was transferred to the Minnesota Security Hospital at St. Peter for treatment and examination. The director of the hospital, Dr. Steven Doheny, initially concluded in December

1985 that Hulin was not competent to be sentenced.

The matter was continued, and in October 1986 a competency hearing was held at which all five expert witnesses testified. All agreed Hulin had suffered anoxic encephalopathy, or damage to the brain due to lack of oxygen. The primary symptom was significant loss of recent memory.

Dr. Doheny testified that Hulin was often disoriented as to time and surroundings and that he had a profound memory loss. Hulin had to be told when to eat, when to go to bed and when to get dressed. Dr. Doheny reported, however, an interview in which Hulin discussed his financial affairs, including the farm his father had left him. Hulin could remember the size of the farm, but not its current financial situation or who was running it. Hulin could not remember a hearing on his guardianship held two days earlier.

Dr. Doheny then questioned Hulin about criminal sentencing and summarized the conversation:

He indicated that he understood in Minnesota that certain behaviors were against the law, and could name several of them, especially traffic violations, but was also able to state that serious offenses, such as stealing and violent offenses, such as harming others, were also wrong. When asked what would happen to individuals who did such things, he indicated that they would "go before a judge and be sentenced." When asked how sentences were imposed, the patient was able to describe that for serious crimes, long sentences in prison were imposed, and for less serious crimes, shorter sentences. When asked what sort of a crime shooting at someone with a gun would be, the patient indicated it would be serious. When asked if the patient had any understanding of any current legal charges against him, he stared blankly. When asked if he remembered anything about his situation, he indicated that he remembers something about guns and something about his friends.

Dr. Doheny found Hulin competent to be sentenced, concluding:

[H]is ability to participate in his defense might be limited based upon the patient's memory problems and concrete thinking, but would not appear insurmountable in this case, especially given the example of the patient's ability to discuss aspects of his estate management which he appears motivated to do. Since the nature of the patient's illness is more akin to a mental deficiency than active mental illness, this case would be similar to a mentally limited or mentally retarded individual who has a rudimentary or concrete understanding of right and wrong, and crime and punishment, and who is able to be processed through the legal system. To consider otherwise would require that all intellectually limited individuals would be permanently unable to be processed through the legal system. This patient is competent within the limits of his ability following his organic brain injury to proceed in sentencing at this time.

Dr. Meier, a neuropsychologist, reported that Hulin had such profound loss of memory functioning, particularly short-term memory, that he was "incapable of comprehending and conceptualizing from the information being [currently] processed." He also found Hulin had lost remote memory back to the age of 16. He concluded that Hulin was not competent and had a poor prognosis.

Dr. Schwarz, a psychologist consulted by the defense, concluded that Hulin could not participate meaningfully in the sentencing proceeding because he would have no understanding of for what he was sentenced. He challenged Dr. Doheny's report because the summary of the interview with Hulin did not indicate the extent of Dr. Doheny's questioning to get the reported responses.

Dr. Philander, a psychiatrist also retained by the defense, testified that Hulin did not have a mature or rational understanding of the proceedings against him and could not discuss the proceedings or identify the personal effect the proceedings would have. Dr. Philander testified that

Hulin recognized he had been found guilty, but could not understand what it meant. Dr. Owen Nelsen, a psychologist retained by the state, testified that he thought Hulin could understand the basics that relate to sentencing, but the extent to which Hulin could apply the basics to his own particular case was limited. Dr. Nelsen testified that Hulin could not see the applicability of sentencing proceedings to him because "he is stating, and I do not believe he is malingering, that he does not recall committing those offenses."

The trial court found Hulin to be competent for sentencing. The court stated that the competency necessary to be sentenced could not be equated with competency to stand trial. The court noted that Hulin had claimed a memory loss of the incident even before the hanging, concluding that although Hulin was not consciously malingering, he remembered more than his examiners gave him credit for. The court indicated it had not imposed on either party the burden of proof on the issue.

## ISSUES

1. Was appellant denied a fair trial by references to statements he had made to witnesses concerning his prior imprisonment?

2. Did the trial court abuse its discretion in refusing to submit the offense of reckless handling of a dangerous weapon without the offense of second-degree assault?

3. Did the trial court clearly err in concluding that appellant was competent to be sentenced?

## DISCUSSION

### I

Hulin's statements to others that he would fight it out with police rather than be taken back to prison were relevant on the issues of intent and premeditation. They were unquestionably of potential prejudicial impact, however, and the prosecutor had agreed to mitigate them by instructing the witnesses to refer only to Hulin's determination to resist arrest and not his determination to avoid a return trip to prison. This agreement should have been honored. Instead, the prosecutor injected the references to prior incarceration in his questioning.

The references to Hulin's past incarceration were not so prejudicial as to deny him a fair trial. The references had more probative value than similar references admitted in other cases. *See State v. Gonzales-Guerrero,* 364 N.W.2d 792, 794 (Minn.1985) (reference to prior rape charges allowed when they provided context for defendant's statement to police). The court in *Gonzales-Guerrero* suggested that prejudicial references may be excised without loss of probative impact, as they could have been here. The evidence of guilt, however, was very strong, and the record was replete with references to Hulin's possession of illegal substances and weapons and his association with convicted felons.

### II

The trial court gave Hulin the choice of submitting to the jury as lesser-included offenses either both second-degree assault and reckless handling of a weapon, or neither.

Second-degree assault is not a lesser-included offense of first-degree murder, because the assault charge requires use of a dangerous weapon, while murder does not. *See State v. Whisonant,* 331 N.W.2d 766, 769 (Minn.1983) (under the statutory definition, one offense must necessarily be included in another offense to be considered lesser-included offense). The same is true of reckless discharge of a firearm. *State v. Frost,* 342 N.W.2d 317, 323 (Minn.1983). Thus, Hulin was not entitled to have either offense submitted. Moreover, the evidence of the extensive shootout that occurred does not establish that the jury could reasonably have found Hulin guilty only of reckless discharge, the lesser offense he wanted submitted.

### III

Minn.R.Crim.P. 20.01, subd. 1, provides:

**Subd. 1. Competency to Proceed Defined.** No person shall be tried or sentenced for any offense while mentally ill or mentally deficient so as to be incapable of understanding the proceedings or participating in his defense.

The supreme court has characterized this as a two-prong test, consisting of (1) capacity to understand the proceedings; and (2) ability to participate in the defense. *See State v. Bauer*, 310 Minn. 103, 110, 245 N.W.2d 848, 852 n. 5 (1976). The question of competency to be sentenced appears to be one of first impression in this state.

The trial court cited the following test of competency to be sentenced:

The proper test of capacity at the time of punishment is whether the prisoner has sufficient intelligence to understand the nature of the proceedings against him, what he was tried for, the purpose of his punishment, the impending fate which awaits him, and a sufficient understanding to know any fact which might exist which would make his punishment unjust or unlawful, and the intelligence requisite to convey such information to his attorneys or the court.

21 Am.Jur.2d *Criminal Law* § 123; *see also Solesbee v. Balkcom*, 339 U.S. 9, 20 n. 3, 70 S.Ct. 457, 462 n. 3, 94 L.Ed. 604 (1950) (Frankfurter, J., dissenting) (giving similar test of insanity after death sentence).

The trial court made diligent inquiry into Hulin's competency, appointing a psychologist to examine Hulin and listening to the testimony and reading the reports of four other experts retained by the state and the defense. The trial court did not place a burden of persuasion on either party. *See generally Bauer*, 310 Minn. at 121, 245 N.W.2d at 858 (neither party bears a burden of persuasion on competency; rather, it is the duty of the court to conduct sufficient inquiry to determine defendant's competency to stand trial).

The medical testimony consistently indicated that Hulin could understand what a sentencing proceeding was, at least in a general or theoretical fashion, and that he knew the roles of the participants and the general principle that the sentence depend-ed on the severity of the offense. This is the first part of the competency test. *Id.* at 110–11, 245 N.W.2d at 852–53 n. 5; Minn.R.Crim.P. 20.01, subd. 1. Hulin could not understand the application of sentencing procedures to himself, because he had lost most memory of the offense. However, amnesia regarding the events surrounding the offense is not itself a bar to prosecution, *Davis v. Wyrick*, 766 F.2d 1197, 1202 (8th Cir.1985), *cert. denied*, 475 U.S. 1020, 106 S.Ct. 1209, 89 L.Ed.2d 322 (1986), or sentencing.

Hulin's ability to meet the second prong of the competency test—capacity to participate in sentencing proceedings—does present a difficult problem. A defendant has the right to controvert any part of the presentence investigation. Minn.R.Crim.P. 27.03, subd. 1. He may move for a sentencing hearing. Minn.R.Crim.P. 27.03, subd. 1(D). In the trial court's discretion, the defendant may testify at the hearing, Minn.R.Crim.P. 27.03, subd. 1(F), and has the right of allocution. Minn.R.Crim.P. 27.-03, subd. 3; *State ex rel. Dugal v. Tahash*, 278 Minn. 175, 181, 153 N.W.2d 232, 236 (1967).

Hulin demonstrated considerable recall of the legal system generally and in Aitkin County specifically. Dr. Owen Nelsen reported:

To my surprise, he was able to identify three judges from the Judicial District in which Aitkin County is located: "Judge Clint Wyant, Judge Graff, and Judge Spellacy." He was aware that he had appeared before a judge and that the judge had sentenced him to the St. Cloud Reformatory, although he could not recall for what reason. This discussion of judges led to further discussion of the criminal justice system in general and Mr. Hulin was able to describe the legal proceedings in criminal matters in considerable detail. He could describe the roles of judge, prosecuting attorney, and defense attorney. He volunteered spontaneously that a court reporter is also present "to write down all the things that happen in court." He knew that in certain situations a jury must determine

guilt or innocence and that a jury consists of 12 individuals.

Although some of Hulin's knowledge was relevant only to his ability to understand sentencing proceedings, he showed some capacity for participation. Dr. Nelsen reported:

When I informed Mr. Hulin that he had been convicted of eleven counts of Attempted First Degree Murder he replied, "I was never going to kill anybody." He asserted, "It's all a lie," but had no idea who might be telling such lies about him or for what reason. I then asked him what he would say to a judge who sentenced him to 20 years in prison for Attempted Murder and he answered, "I didn't do it." Mr. Hulin was also able to provide reasonable estimates of appropriate periods of incarceration for conviction of offenses of varying severity.

There was also medical testimony that Hulin was not able to communicate with the court or counsel about the proceedings. However, taking all the evidence as a whole, we believe there was sufficient support for the trial court's finding that Hulin was competent to be sentenced. We note that a record had been developed on the facts of the offense and Hulin's background. A presentence investigation had been prepared and distributed prior to the suicide attempt. Defense counsel was not required to rely on Hulin's memory.

## DECISION

Appellant was not denied a fair trial by references to his prior incarceration. The trial court did not abuse its discretion in refusing to submit offenses which were not lesser-included offenses. The trial court did not err in concluding that appellant was competent to be sentenced.

Affirmed.