STATE of Minnesota, Respondent,

v.

Maime Hernandez MILLS, Appellant.

No. C4–96–1327.

Supreme Court of Minnesota.

April 10, 1997.

Steven P. Russett, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey III, State Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., Jean Burdorf, Asst. County Atty., Minneapolis, for respondent.

## OPINION

STRINGER, Justice.

Appellant Maime Hernandez Mills was convicted of aiding and abetting the first-degree murder of her husband, Theotis Mills. On appeal, appellant asserts that the trial court committed reversible error in concluding that she was competent to stand trial, denying defense motions to exclude various statements of appellant as being made involuntarily and in violation of her *Miranda* rights, refusing to exclude testimony of appellant's accomplice and the investigating officers as prejudicial character evidence, and granting state motions to exclude testimony regarding appellant's psychiatric history and

a videotape of appellant's interrogation by investigating officers. We hold that the trial court properly determined that appellant was competent to stand trial and that none of its evidentiary rulings constituted an abuse of discretion. We therefore affirm.

At approximately 2:45 p.m. on February 6, 1995, police responded to a 911 call reporting a burglary and shooting at 2719 Upton Avenue North in Minneapolis. Present at the house at the time of the police officers' arrival were appellant and her son, Nathan Wayne Lattu ("Lattu"). In their investigation, the officers noted that a closet in the downstairs bedroom was open and several drawers had been pulled out of a dresser next to the bed, tipped over, and emptied onto the floor. The officers then proceeded upstairs where they found the body of Theotis Mills lying face down on a bed and bleeding from a large gunshot to the right side of his head. Lattu, who had followed the officers upstairs, directed their attention to a typewritten note lying next to the body which read: "this is for our bud that you sent to jail mother fucker rest in peace." [1] Later, Lattu was adamant about showing the officers a note he had been given by an administrator at the Fort Snelling V.A. hospital indicating that Lattu had been at the hospital from 1:15 to 2:00 that afternoon to pick up an I.D. card. He also insisted that the officers check the caller I.D. feature of their telephone, stating that he and appellant had called the victim from the V.A. hospital to let him know they had made it there safely.

After police secured the crime scene, both appellant and Lattu were transported to the Minneapolis Police Department to be interviewed. The interview of appellant was conducted by Officer Jim DeConcini who later testified that, at that point, he had no information that would lead him to believe that appellant was involved in the crime. Rather,

the purpose of the interview was to gather information about the crime scene and what had happened that day to aid the officers in their investigation. In a recorded question and answer session, appellant told Officer DeConcini that the victim arrived home from working the overnight shift at Shamrock Industrial at about 7:20 that morning, fixed breakfast, and watched some television. It was his habit to watch television until about 2:00 in the afternoon and then go to bed. Appellant stated that she and Lattu left home at about 12:15 p.m., drove to a nearby Super Valu store to cash a personal check, and then went to the V.A. hospital to pick up Lattu's I.D. card. She further stated that, while they were at the hospital, she called home twice because the victim had a rule that whenever appellant went somewhere she had to call when she got there to let him know she had arrived safely. Appellant said the victim did not answer either of her calls. Then, appellant stated, she and Lattu left the hospital, drove home, and, when they arrived at the house at about 4:00 p.m., they noticed that the window in the back door was broken, the drawers from the dresser next to the bed were overturned and the victim was lying in bed covered in blood.

Detectives David Palmer and Robert Krebs were assigned to investigate the case and, the day after the murder, Detective Palmer again interviewed appellant and Lattu.[2] During that interview with appellant, Palmer learned that appellant had been married to the victim for fourteen years, that the victim had hired a private investigator in 1993 to help find Lattu, that appellant and Lattu were reunited in December of 1993, and that Lattu came to live in the Mills home in October 1994.

While the detectives initially considered the possibility that the killing was the result

---

**1.** The victim had previously been shot in an attempted robbery of the Mills home and the burglar, Victor Lopez, had been apprehended and convicted. Therefore, one of the initial theories considered by investigators was that someone had come into the house and killed the victim "as a revenge type thing."

**2.** Edward Claibon, a neighbor of appellant and Lattu who works in the victim/witness unit of the

Hennepin County Attorney's office, brought appellant and Lattu to the police department to assist them in finding a place to stay while their house was closed for the investigation. Claibon spoke with Detective Palmer who requested that he bring Lattu to Palmer's office for an interview. Detective Palmer also met with appellant while they were there.

of a burglary or was motivated by revenge for the Lopez incident, Detective Krebs testified that several factors led them to suspect the involvement of appellant and Lattu. The officers believed that the burglary seemed staged and that Lattu's behavior during the 911 call and at the scene of the initial investigation was not consistent with what would normally be expected from someone who had just found a loved one dead. Furthermore, when the broken back door window was checked for fingerprints, the only prints found were in the area of the break and a latent print matching those of Lattu was found on the fracture line of the plexiglass. While the half of the print on one side of the fracture line was clearly identifiable as that of Lattu, the half of the print on the other side of the line was smudged, indicating that the print was made at the time the glass was fractured.

Detectives Palmer and Krebs interviewed Lattu and appellant again on February 16, 1995. Because appellant and Lattu were now the primary suspects in the murder, they were apprised of their *Miranda* rights prior to the interviews and the interviews were videotaped. Upon being confronted with the fingerprint evidence, Lattu broke down and told the detectives that he had handwritten the words that appeared on the note found near the victim's body on a torn envelope, given the handwritten note to appellant, and left the rest of the torn envelope in the victim's Chevrolet Blazer. He further admitted that he and appellant had written the note, faked the burglary, and that appellant had shot and killed the victim with the victim's shotgun as he slept.[3]

The detectives then confronted appellant with the information obtained from Lattu. During the Mirandized, videotaped interview, appellant emphatically denied that she had anything to do with the victim's murder. Appellant stated, however, that the victim did in fact own a large hunting-type gun and demonstrated that she knew how to use it in

a manner that suggested it was a bolt action weapon. She also told the detectives that one of her "personalities" had once tried to poison the victim.[4] Appellant was arrested at the close of the interview.

The following day Detectives Krebs and Palmer went to the home of Brice Jermain. Appellant had told the detectives that she was employed by Jermain as a housecleaner and, during his confession, Lattu gave the officers information concerning the authoring of the note left at the murder scene which led them to believe that it had been typed at Jermain's house. Jermain directed the detectives to his typewriter which they took and turned over to Karen Runyon, the document examiner for the Minneapolis Police. Upon examining the typewriter ribbon, Runyon determined that, after two to four attempts by the typist, the phrase from the note found at the murder scene had in fact been typed on Jermain's typewriter. A comparison of the paper fibers found on the typewriter ribbon with those of the note from the murder scene confirmed that the note was typed on Jermain's machine.

At trial, the various officers and investigators who had worked on the case testified as to the investigation they had conducted, the evidence they had obtained, and the statements made by appellant and Lattu. Lattu also testified on behalf of the state. Lattu testified that he and appellant had a sexual relationship and that they had killed the victim "for sex and money." He stated that, four days before the murder, he wrote out the message found next to the body in longhand on a piece of an envelope and that appellant then took the envelope scrap to work with her and typed the note on her employer's typewriter. Then, at approximately 12:15 p.m. on February 6, he and appellant sneaked upstairs while the victim was sleeping and appellant shot the victim in the head. Lattu then retrieved the typewrit-

---

3. Later that day, Lattu led officers to a wooded area near Barnum, Minnesota, where they recovered a 16 gauge bolt action shotgun.

4. The poisoning incident occurred in 1987. At trial, the jury was told by stipulation of counsel that appellant voluntarily submitted herself for a

psychiatric evaluation in February 1987, in part because she had attempted to poison her husband, and that, in April of that year, she was committed to Anoka Metro Regional Treatment Center as mentally ill but not dangerous.

ten note from appellant's purse and placed it next to the victim's body.

Lattu further testified that, after appellant shot the victim, Lattu broke the plexiglass window of the back door "to make it look like an intruder came in" and the two of them left the house. After stopping at the Super Valu store to cash a check, appellant and Lattu went to the V.A. hospital where they picked up Lattu's I.D. card, made two phone calls home to establish their alibi on the caller I.D. system, and obtained a note from the V.A. officer stating that Lattu had been at the hospital from 1:15 to 2:00 p.m.. They then returned home, pulled out several drawers to simulate a robbery, and called 911. Lattu initially hid the shotgun in a pipe in the basement of the house and, on February 15, he drove north to a wooded area near Moose Lake, Minnesota, and buried the gun in the snow under a pine tree.

In addition to Lattu and the investigating officers, the state presented several witnesses who corroborated aspects of Lattu's testimony. While there was no direct evidence that appellant and Lattu were engaged in a sexual relationship prior to the murder, several witnesses testified that their relationship seemed unusually close. Also, Ken Hinsdale, a personnel administrator at the V.A., testified that appellant and Lattu came to him on February 6 to obtain an I.D. card for Lattu. While there, appellant and Lattu each made a short phone call from a telephone in the front office. Both of them also requested that Hinsdale write Lattu a note stating that he had been in the office that afternoon. Finally, Brice Jermain testified that appellant cleaned his house on February 2, 1995. He further stated that the typewriter that was seized from his house and examined by Karen Runyon belonged to him and his partner Frederick Keen, but that he had never used it. Keen similarly testified that, although he owned the typewriter, he did not type the note found at the murder scene.

Witnesses also testified as to statements made by appellant after the murder. Kollette Lattu, another of Lattu's relatives, testified that Lattu, appellant, and David Lattu were invited to a birthday party for Lattu's grandfather on February 15 but refused to attend. She further stated that appellant later called her and asked her to convince David Lattu to attend the party. Kollette Lattu did so and David Lattu attended the party, which was held on the same day that Lattu stated that he drove up north and hid the shotgun. Jan Koncur, a human resources manager for the victim's employer, testified that the victim had $62,500 in life insurance and $8,000 in a 401K plan and that appellant called her within two days of the murder inquiring as to whether the victim had life insurance.

Appellant, on the advice of counsel, did not testify at her trial. The jury found appellant guilty of aiding and abetting murder in the first-degree and she was sentenced to life in prison.

## I. Competency

Appellant first argues that the trial court erroneously concluded that she was competent to stand trial. The criminal prosecution of a defendant incompetent to stand trial constitutes a denial of due process under the Fourteenth Amendment. *Medina v. California*, 505 U.S. 437, 439, 112 S.Ct. 2572, 2574, 120 L.Ed.2d 353 (1992). "[T]hroughout the course of criminal proceedings a trial judge must be vigilant in ensuring that the defendant is competent to stand trial and * * * must observe procedures adequate to ensure the defendant's competency." *State v. Bauer*, 310 Minn. 103, 114, 245 N.W.2d 848, 854 (1976). The standard for competency to stand trial is set out in Minnesota Rule of Criminal Procedure 20.01, subd. 1.

A defendant shall not be permitted to enter a plea or be tried or sentenced for any offense if the defendant:

(1) lacks sufficient ability to consult with a reasonable degree of rational understanding with defense counsel; or

(2) is mentally ill or mentally deficient so as to be incapable of understanding the proceedings or participating in the defense.

Minn.R.Crim.P. 20.01, subd. 1. The standard of proof in a competency hearing is a preponderance of the evidence. *See* Minn. R.Crim.P. 20.01, subd. 3(6). Appellant's ability to understand the nature of the proceed-

ings was not disputed; therefore the only issue before us is whether the trial court erred in concluding that appellant had sufficient ability to consult with her attorneys with a reasonable degree of understanding and to participate in her defense.

Prior to trial, at the request of defense counsel, the trial court ordered that appellant undergo an evaluation to determine whether she was competent to stand trial and a formal competency hearing was held on April 1 and 5, 1996. Defense attorney Claudia Engeland testified that appellant was difficult to work with because her moods were extreme and unpredictable, and she often became disruptive and uncooperative. While Engeland also stated that appellant sometimes had no awareness of why she was in jail and was unable to distinguish the advice given by her attorneys from that given by other inmates, the two experts who examined appellant agreed that she did not suffer from a defect of reason, and that she was capable of communicating rationally with counsel. The experts disagreed however, on whether appellant had a personality disorder which would render her unable to participate in her defense.

According to Dr. Owen R. Nelson who testified on behalf of the defendant, appellant suffered from a "personality disorder not otherwise specified with borderline and histrionic features." Dr. Nelson opined that this disorder caused appellant to suffer mood swings and act in ways that were self-defeating. He therefore concluded:

> although she satisfies many of the criteria for competency in terms of cognitive knowledge of the process, * * * in my opinion she is not capable, or was not capable at the time I saw her in late December 1995 of sustaining in any continuous manner an ability to participate with [counsel] in getting ready for and implementing a defense to the charges [against] her.

Dr. Nelson further testified that, while it was possible that medication could help alleviate her mood swings and make appellant "more competent," because her personality disorder related to longstanding maladaptive patterns

of behavior, "the degree to which we could expect a change would be limited."

Dr. Carl Malmquist, a court-appointed psychiatrist, testified on behalf of the state. He evaluated appellant in April 1995 and again in April 1996 at the request of the court. Based on these two evaluations, Dr. Malmquist concluded that, while appellant did have a "great dramatic quality," she was amiable and was able to organize her thoughts and talk logically about the day of the murder. He noted that while appellant showed some signs of depression, she was able to laugh on occasion, could recall details, could communicate her views logically and forcefully, and was adamant in her opposition to pleading to a lesser charge or asserting a mental illness defense. Dr. Malmquist further stated that appellant had a good deal of trust in her attorneys, especially Mike Colich. Finally, Dr. Malmquist opined that, because appellant believed that it was her right to express herself when she wanted to, she might potentially be disruptive in the courtroom. He stated however, that this tendency did not arise from a psychotic state but rather simply from the fact that appellant was mistrustful of the system and felt she had to look out for her own interests. According to Dr. Malmquist, appellant did not have a thinking disorder and, while she could be dramatic and disruptive when she wanted to be, such behavior simply demonstrated an unwillingness, rather than an inability, to cooperate with counsel.

The trial court found that appellant was clearly aware of the participants of the court proceedings and their roles and that she was not suffering from a major mental illness. As to personality disorders, the court stated that, given the many different diagnoses appellant had received over the years, it was "not exactly clear what her personality profile is specifically." The court then noted that appellant appeared to be directable during court proceedings and stated that it was significant that she had a good relationship with co-defense attorney Colich. The court therefore concluded that, although appellant would be a challenging client to work with, she was competent to stand trial.

Both experts were in agreement that appellant did not suffer from a defect of reason. While she probably did suffer from a personality disorder that made her difficult to work with, Dr. Nelson's opinion that such a disorder made her unable to participate in her defense was no more reliable than Dr. Malmquist's conclusion that appellant could cooperate effectively with counsel if she chose to do so; in fact, the trial record indicates that appellant had a good relationship with Colich, was able to make key decisions regarding her defense,[5] and did not engage in any disruptive or inappropriate behavior during testimony. We therefore hold that the trial court gave proper weight to the evidence relating to competence and that its finding of competency is adequately supported by the record.

## II. Voluntariness of Appellant's Statements and Waiver of *Miranda* Rights

■ Appellant next argues that the state failed to prove that statements she made to various law enforcement officers prior to and after her arrest were voluntarily made or that she validly waived her *Miranda* rights. Whether a defendant has voluntarily waived her right to remain silent and whether statements made by the defendant were made voluntarily are two separate issues. *State v. Williams,* 535 N.W.2d 277, 287 (Minn.1995) (citations omitted). However, the factors to be considered are the same and, therefore, the analysis of the two issues significantly overlaps. *Id.* The fact that a defendant suffers from a mental deficiency is, alone, insufficient to render a statement or a waiver of *Miranda* rights involuntary. *Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986). Instead, coercive police activity is a predicate to a finding that a statement or waiver was made involuntarily. *Id.* at 167, 170, 107 S.Ct. at 521–22, 523. Voluntariness must be shown by a preponderance of the evidence and the question for the court is whether, considering the totality of the circumstances, the police actions were "so coercive, so manipulative, [or] so overpowering" that defendant's will was overborne. *State v. Pilcher,* 472 N.W.2d 327, 333 (Minn.1991). In reviewing a trial

court's determination of voluntariness, we make an independent determination of voluntariness on the facts found, but do not reverse findings of fact unless they are clearly erroneous. *State v. Hardimon,* 310 N.W.2d 564, 567 (Minn.1981).

### a. February 6–7, 1995 statements

■ At the time appellant was interviewed by police officers on February 6, 1995, she was not under arrest. Officer DeConcini testified that, at that point, "everyone was a suspect and no one was a suspect." Appellant was being interviewed as a "[v]ery important witness, the widow of the deceased and the person who co-discovered the body." Appellant was driven to the interview in a police car but DeConcini testified that she was not in custody and that it is not unusual for the police to provide transportation for people they want to interview. She was asked general questions about the chronology of events on the day of the murder and whether the victim kept guns in the house, but Deconcini never challenged her story or asked her if she had committed the murder. DeConcini testified that she was able to track his questions and the transcript of the question and answer session makes it clear that she was capable of providing logical answers. Appellant never requested that the interview be stopped. DeConcini's questions were factual and straight forward and the record is devoid of coercion, manipulation, or trickery.

■ Detective Palmer similarly testified that when he interviewed appellant on February 7, she was "not really a suspect" in the murder. Rather, the purpose of the interview was simply to establish a rapport with her and to gain a better understanding of the case. Appellant was not arrested and she and Lattu were given a ride home after the interview. Again, there is no indication that appellant objected to the interview or that Palmer engaged in any coercive conduct. We therefore hold that the trial court properly admitted appellant's February 6–7 statements into evidence.

5. Appellant decided to reject the state's plea offer and elected not to testify on her own behalf.

### b. February 16, 1995 Interrogation

Detectives Palmer and Krebs questioned appellant again on February 16, 1995. Because Lattu had just confessed and appellant was now the primary suspect in the murder, the detectives advised appellant of her *Miranda* rights prior to questioning and videotaped the interview. At trial, Detective Krebs testified that, during this interrogation, appellant told the detectives that she had once tried to poison the victim and demonstrated that she knew how to use a bolt-action gun.

The videotape shows the detectives advising appellant of her *Miranda* rights. Upon inquiry as to whether she understood them, appellant told the detectives that she understood that she did not have to talk to them but stated that she had "nothing to hide." The detectives then told appellant about the evidence that led them to suspect her and Lattu and informed her of Lattu's confession.

Appellant denied any involvement in the victim's death and, when the detectives asked about her relationship with the victim, appellant stated that she and the victim got along "great" but that she often got mad. At that point, the detectives asked her whether it was her or one of her personalities that got mad and whether it was possible that one of her personalities killed the victim. Appellant replied that she did not know, but that awhile back one of her other personalities tried to poison the victim. Relative to the murder weapon, appellant demonstrated that she knew how to use the victim's bolt-action "big gun." At that point the detectives placed appellant under arrest.

This court has stated that the fact that police officers use a sympathetic approach in interrogating a suspect does not, in itself, render a defendant's statements involuntary and it is not improper to inform a defendant of the inculpatory evidence the police have gathered. *Pilcher*, 472 N.W.2d at 333–34. Further, the fact that a defendant is emotionally distressed does not necessarily make her statements involuntary.

*Id.* at 334. While Palmer and Krebs' approach had sympathetic elements, appellant spoke rationally throughout most of the 45 minutes of questioning. The only question even arguably coercive was whether one of her other personalities could have committed the murder; but neither the question asked nor appellant's response, "I don't know," were introduced at trial. Finally, given that appellant did not in fact confess, it cannot be said that her will was overborne by the detectives' questioning, *see id.* ("That he adhered to this woven tapestry of lies shows that [the defendant's] will was not overborne."), and we therefore conclude that appellant's waiver of *Miranda* rights and her statements during the February 16, 1995 interrogation were voluntary.

### c. Statements Made to Deputy Sanders While in Jail

Appellant also argues that various statements she made to Deputy Linda Sanders while in Hennepin County Jail were obtained through an exploitation of appellant's mental problems and were therefore involuntary and should not have been admitted at trial. Appellant argued at the *Rasmussen* hearing that the statements she made to Sanders were obtained in violation of appellant's Sixth Amendment right to counsel. Appellant did not argue, as she does now, that the statements were involuntary. Because the issue was not raised below, it was waived. *See State v. Sorenson*, 441 N.W.2d 455, 457 (Minn.1989) ("Usually, we will not decide issues which are not first addressed by the trial court and are raised for the first time on appeal even if the issues involve constitutional questions regarding criminal procedure.") (citations omitted).

### III. Evidentiary Matters

### a. Admission of Evidence of Appellant's Prior Attempt to Poison the Victim

Appellant argues that she was denied a fair trial when the court allowed the prosecution to elicit testimony that appellant had once tried to poison the victim.[6] Under

---

6. Appellant also asserts that the trial court improperly allowed Lattu to testify that appellant had a violent disposition. Appellant did not object to Lattu's testimony at trial however and, therefore, to the extent that any testimony may have been improper, appellant's objection was

the Minnesota Rules of Evidence, "[e]vidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Minn R.Evid. 404(b). Character evidence which tends to show the "strained relationship" between the accused and the victim is relevant to establishing motive and intent and is therefore admissible. *See State v. Flores,* 418 N.W.2d 150, 159 (Minn.1988); *State v. Blanchard,* 315 N.W.2d 427, 431 (Minn.1982). For such evidence to be admitted, the trial court must determine that there is clear and convincing evidence that the defendant committed the prior bad acts sought to be admitted and, further, that the probative value of the evidence outweighs any potential for unfair prejudice. *Flores,* 418 N.W.2d at 159 (citations omitted). We generally defer to the trial court's exercise of discretion in evidentiary matters of this nature and will reverse only where there has been a clear abuse of discretion. *State v. Kelly,* 435 N.W.2d 807, 813 (Minn.1989).

While appellant concedes that Krebs' testimony regarding appellant's 1987 attempted poisoning of the victim may have been relevant to showing the relationship between appellant and the victim, she argues that the probative value of the evidence was outweighed by its potential for unfair prejudice. The jury was aware that the poisoning incident occurred over eight years prior to the murder, that appellant was suffering from a major mental illness at the time of the poisoning attempt, and that there was no evidence that appellant and the victim had a strained relationship in 1995 or that appellant was suffering from a major mental illness at the time of the murder. Therefore, the trial court could well conclude that the probative value of the evidence outweighed the danger that it would cause the jury to make an unfair inference as to appellant's character. Consequently, we hold that the trial court did not abuse its discretion by admitting Krebs' testimony.

### b. Exclusion of Evidence of Appellant's History of Mental Illness

 Next, appellant asserts that the trial court ruling excluding reference to appellant's documented history of mental illness denied her a "meaningful opportunity to present a complete defense."[7] *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984). Minnesota does not recognize the defense of diminished responsibility and this court has further held that psychiatric evidence is not relevant to establishing intent or premeditation. *State v. Bouwman,* 328 N.W.2d 703, 705–06 (Minn. 1982). As such, "psychiatric opinion testimony is generally not admissible during the guilt phase of a * * * trial." *State v. Persitz,* 518 N.W.2d 843, 847 (Minn.1994) (citation omitted). Psychiatric evidence may be admissible however, where the defendant has a past history of mental illness:

> If the past history includes a clinical record wherein psychiatric opinions appear * * *, it may be that such evidence would be admissible. * * * This evidence is in the nature of factual background to explain "the whole man" as he was before the events of the crime and before the miasma of after-the-crime rationalizations.

*State v. Provost,* 490 N.W.2d 93, 103–04 (Minn.1992) (citations omitted), *cert. denied,* 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 694 (1993). In determining whether to admit such evidence, the trial court should require an offer of proof on the admissibility of the evidence and carefully weigh the relevancy and probative value of the proffered evidence against the likelihood of prejudice or confusion. *Id.* at 104.

Appellant argues that the evidence regarding her psychiatric history was not offered to

---

waived. *See State v. Vance,* 254 N.W.2d 353, 359 (Minn.1977) (stating that a failure to object to testimony at trial generally bars a defendant from objecting to its admission on appeal).

7. The court allowed the defense to advise the jury that, at the time she allegedly poisoned her husband, appellant was committed as mentally ill but not dangerous, but it precluded the defense from eliciting "discussion by other witnesses of Ms. Mills' other mental health histories or diagnoses, at all."

prove lack of premeditation or intent but rather to show "the person she is" and "whether she was, in fact, controlling Mr. Lattu." We agree with the trial court however, that, given the myriad of different diagnoses appellant had received over the years, introducing evidence of her mental history would have shed little light on who was the "whole person." Further, while Lattu did claim that appellant took charge of certain aspects of the murder, it made little difference to the prosecution's theory of the case who was controlling whom, given the fact that both appellant and Lattu were convicted of aiding and abetting the murder and there was ample evidence that they worked together in its commission. The trial court's concern that the introduction of the appellant's mental history would have created a substantial danger of confusing the issues or misleading the jury was well founded, as the jury could have improperly viewed appellant's psychiatric problems as providing a defense or mitigating her culpability. We therefore hold that the trial court did not abuse its discretion in refusing to admit evidence of appellant's psychiatric history.

■ Appellant also asserts that statements she made to Deputy Sanders while in jail should have been admitted under the "rule of completeness"[8] but, because those statements also fell under the trial court's general exclusion of evidence relating to appellant's psychiatric history, they were properly excluded. Nor do appellant's statements to Deputy Sanders relating to her history of mental illness become admissible under the principle that "the opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance." 7 J. Wigmore, *Wigmore on Evi-*

dence § 2113 at 653 (Chadbourne rev.1978). As we have stated,

> [t]he theory that inquiry into part of a conversation opens the door for the admission of all the conversation may be an appropriate theory in some instances because admission of a part of some conversations taken out of context may require that all the conversation be gone into to give the court and jury a correct understanding of the facts. *It is not a rule that should be applied in all cases.*

*State v. Whelan,* 291 Minn. 83, 88, 189 N.W.2d 170, 174 (1971) (emphasis added). The statements appellant sought to introduce were hearsay, not qualifying for admission under an exception to the hearsay rules, and were properly excluded under the trial court's broad prohibition of evidence relating to appellant's earlier mental illness.

c. Exclusion of the Videotape of the February 16, 1995 Interrogation

■ Appellant argues that portions of her videotaped interview should have been admitted to explain and clarify Detective Krebs' testimony that, during the interview, appellant stated that she had once tried to poison the victim and showed the detectives that she knew how to load and shoot a bolt action gun. She further asserts that the entire videotape should have been admitted to provide context and to show the jury "the circumstances in which appellant's statement was made." The trial court excluded the videotape as hearsay.

■ Appellant asserts that she should have been allowed to introduce those portions of the videotape in which appellant stated that "one of my personalities" tried to poison the victim and that at other times she and the victim "got along great," in order to explain and clarify Krebs' testimony that she admitted to trying to poison the victim. As stated above, the "rule of completeness" ap-

---

**8.** Appellant cites Minn.R.Evid. 106 as support for this argument. Rule 106 states:

> When a *writing or recorded statement* or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Minn.R.Evid. 106 (emphasis added). The original committee comment to the rule specifically states that "[t]he rule is not intended to apply to conversations." Minn.R.Evid. 106 Cmt. (1977). Deputy Sanders was testifying as to a conversation she had with appellant. No writing or recorded statement was introduced into evidence and Rule 106 does therefore not apply.

plies only where it is necessary to give the jury a full understanding of the facts and it may not be used to introduce otherwise irrelevant statements. Appellant argues that her statement that one of her "other personalities" tried to poison the victim was necessary to clarify Krebs' "misleading" testimony that appellant admitted to the attempted poisoning. Because mental illness was not appellant's asserted defense, however, the trial court properly determined that additional information about her psychiatric history was irrelevant. As to those portions of the videotape where appellant stated that she did not know how to shoot a gun, the trial court properly concluded that it was inadmissible self-serving hearsay.[9] *See State v. Taylor,* 258 N.W.2d 615, 622 (Minn.1977). Appellant's right to a fair trial was adequately protected by her opportunity to cross-examine Krebs on this issue and the trial court's assurance before trial that if the officers in any way mischaracterized appellant's statements, they would be subject to impeachment using the tape.

Finally, appellant argues that, under *Crane v. Kentucky,* 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), the entire videotaped interview should have been admitted to provide context and to allow the jury "to observe firsthand the psychological pressure brought to bear on appellant by her interrogators." In *Crane,* the Supreme Court held that "evidence surrounding the making of a confession bears on its credibility" and a defendant therefore has a Sixth and Fourteenth Amendment right to introduce such evidence at trial. *Id.* at 688, 690, 106 S.Ct. at 2145, 2146–47 (citation omitted). In so holding, the court stated that the defendant's right to present a defense:

> would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to

have the prosecutor's case encounter and "survive the crucible of meaningful adversarial testing."

*Id.* at 690–91, 106 S.Ct. at 2147 (citations omitted). Thus, the question is whether the videotape was "competent, reliable evidence" that was excluded without a "valid state justification."

In *State v. Taylor,* 258 N.W.2d 615, 622 (Minn.1977), we held that a stenographic statement given by the defendant the day after the commission of the crime was properly excluded as self-serving hearsay because "[t]o permit the introduction of such statements could afford a defendant the opportunity to present his version of the facts without ever being subject to cross-examination by the state." Here, as in *Taylor,* much of what appellant argues should have been admitted was self-serving hearsay relating to her version of what happened on the day of the murder, and irrelevant as it related to her mental health history. It was not competent evidence and was properly excluded by the trial court.

The court's evidentiary rulings represented a careful balance between allowing the prosecution to present its case regarding appellant's statements and interviews and protecting appellant's right to present a meaningful defense, and did not constitute an abuse of the court's discretion. We therefore affirm the judgment of the trial court.

Affirmed.

---

9. It should also be noted that appellant did not attempt to bring these statements in on cross examination. Given that the statements were contradicted by appellant's later admission that she could in fact shoot a gun, the decision not to cross-examine Krebs on this issue may well have been a strategic one.