STATE of Minnesota, Respondent,

v.

Jairam GANPAT, Appellant.

No. A06–1176.

Supreme Court of Minnesota.

June 7, 2007.

Lori Swanson, Attorney General, Saint Paul, MN, James C. Backstrom, Dakota County Attorney, and Cheri A. Townsend, Assistant Dakota County Attorney, Dakota County Judicial Center, Hastings, MN, for respondent.

Jodie L. Carlson, Assistant State Public Defender, Office Of The Public Defender, Minneapolis, MN, for appellant.

## OPINION

HANSON, Justice.

Appellant Jairam Ganpat was convicted of first-degree premeditated murder, second-degree intentional murder, and second-degree unintentional felony murder of his girlfriend, Moonku Persaud. Ganpat argues that the district court erred (1) by concluding that he was competent to stand trial, and (2) denying his motion to suppress statements he made to police. We affirm.

On February 18, 2005, police officers entered the victim's home in Eagan, Minnesota, after receiving reports from the victim's daughter and sister that they had not heard from the victim in a few days. Police found the victim lying dead at the foot of the bed. The victim had a rope tightly tied around her neck and around the foot of the bed. The victim had defensive wounds and significant injuries to her head, hands, and neck. There was no evidence of a forced entry and one of the victim's vehicles, a Nissan Pathfinder, was missing. It was determined that the victim died of strangulation and blunt force trauma to the head on late February 16 or early February 17. Police learned that Ganpat lived with the victim and he became a suspect.

On February 20, 2005, Department of Homeland Security Customs and Border Protection officers questioned Ganpat at the Veterans International Bridge in Brownsville, Texas and inspected the vehicle he was driving, the missing Pathfinder. The officers discovered that: (1) Ganpat had about $4,460 in cash and 3,670 Mexican pesos on his person; (2) Ganpat had been in Mexico for only one day; (3) his trip originated in Minnesota; (4) he had about 23 pieces of jewelry, mostly women's,[1] which he said belonged to his girlfriend; and (5) there was a bruise on his hand. The officers learned that Ganpat was wanted for murder, placed him under arrest, and contacted Eagan detective Steven Bolluyt.

On February 21, 2005, Bolluyt and another detective, Brian Gunderson, flew to Texas. At 9:00 that morning, the detectives questioned Ganpat in the jail library for about 13 minutes. Bolluyt read Ganpat his *Miranda* rights and Ganpat said that he understood his rights. After Bolluyt asked Ganpat if he wanted to talk to him, Ganpat replied "[n]ot right now," because he was "not feeling well right now." The detectives inquired about Ganpat's health and indicated to Ganpat that he had a short window of opportunity to speak with the detectives. Three times the detectives inquired about whether Ganpat would talk to them later when he was feeling better, to which Ganpat replied that he would.

Later that evening, at 6:51 p.m., the detectives attempted to speak with Ganpat again. At the beginning of the interview the detectives explained the purpose of the interview, but they did not read Ganpat his *Miranda* rights again. The detectives told Ganpat what they had uncovered in their investigation, gave him an opportunity to explain himself and to bring closure, asked if there was anything Ganpat wanted to relay to his family members, and reminded Ganpat that he had a short window of time in which he could speak with the detectives

---

**1.** In particular there was a diamond ring that was later identified as the diamond ring the victim often wore on her left ring finger.

before they returned to Minnesota. Ganpat said he did not want to talk.

About 30 minutes later, Bolluyt visited with Ganpat again, indicating that the detectives were leaving Texas the next day and wanted to know whether, if Ganpat felt better the next day, he would be interested in speaking with someone. Ganpat said he would. Before Bolluyt left the interview room, he read Ganpat his *Miranda* rights and asked if Ganpat understood those rights, but Ganpat did not indicate whether he understood.

February 28, 2005, at 10:50 p.m., after Ganpat had been extradited to Minnesota, Bolluyt met with Ganpat in an interview room at the Dakota County Sheriff's Office. Bolluyt discussed what he had uncovered in his investigation, inquired about Ganpat's children and family, asked if Ganpat needed anything, and explained that he could not put other people's opinions or his own opinion in his report, but only what Ganpat told him. Ganpat said he could not remember what happened: "I don't really know what happened that night. I do remember wak[ing] up in the morning and see[ing] her lying down there." Bolluyt encouraged Ganpat to talk about what he could remember and said "[i]f there's something that you don't [want to] talk about, you can say I don't remember." Bolluyt read Ganpat his *Miranda* rights. Ganpat asked "Can we do this tomorrow?," but Bolluyt said "I think it would help you tonight." Ganpat said that he understood his rights.

Ganpat proceeded to tell Bolluyt that both the victim and he went to sleep and when he woke up he "was sitting by the bed and she was lying down on the ground" of the bedroom. Ganpat told Bolluyt that he got scared, took a shower, put clothes into suitcases, and left in the Pathfinder. He said that he went to get some money from a bank in Bloomington, but was denied access to his funds, and then went to put gas in the Pathfinder. He said he remembered that the Pathfinder did not have insurance on it, so he returned to the house in Eagan, called the insurance agent and requested that insurance be placed on the Pathfinder. He said he gave the pet bird a whole bag of food. He said that he had also retrieved $5,000 in cash hidden in a drawer in the house and also took several pieces of jewelry. Ganpat explained that after one night in Mexico, he decided to return to Minnesota because he "was doing things that [he did not] know what [he] was doing," and he wanted to "tell the cops [the victim was] in the house." Ganpat adamantly denied killing the victim.

On February 9 and 13, 2006, a competency hearing was held to determine whether Ganpat was competent to stand trial. Three experts testified at that hearing.

Dr. Peter Marston, a clinical psychologist retained by the defense, opined that Ganpat was mentally retarded and that it would be a "real stretch" to conclude that Ganpat was competent to stand trial. Dr. Marston concluded that Ganpat did not have "very good adaptive capability" because "he couldn't keep jobs," but he was puzzled that Ganpat had a valid driver's license because it did not seem likely that a person with an IQ score of 58 could pass a driver's license test. Dr. Marston testified that Ganpat "didn't have a problem focusing or concentrating or conversing * * * or anything that seemed to interfere with his functioning." He said that even if Ganpat experiences hallucinations,

it doesn't seem that they are interfering with his functioning or interfered with his functioning in and around the time. * * * He doesn't have a thought disorder that's readily apparent to me. He doesn't have internal voices that are dis-

tracting him that are in any way evident. * * * [H]e doesn't appear to be schizophrenic.

Dr. Marston also acknowledged that: "The other doctors say he made this stuff up. He may have. You know, I don't know. I don't know if he made some of it up or if he's added to it. I just don't know if he has been coached about it." Ultimately, Dr. Marston concluded that it was "not entirely clear" if Ganpat was suffering from a psychosis that affects his intellectual functioning.

Dr. Donn Nelson, the court-appointed psychologist, said that Ganpat was depressed and had a history of alcohol abuse and pathological gambling, but was likely malingering as to any major mental illness and intellectual ability. The tests performed by Dr. Nelson concluded that Ganpat had a full range I.Q. score of 72. He opined that Ganpat was not mentally retarded and was competent to proceed to trial.

Dr. Karen Bruggemeyer, the state's forensic psychiatrist, diagnosed Ganpat with malingering, major depressive disorder, alcohol abuse, pathological gambling, and antisocial behavior. Dr. Bruggemeyer opined that Ganpat was not mentally retarded and was competent to stand trial. Dr. Bruggemeyer testified that "the low scores that [Ganpat] got on his tests were not consistent with the bigger picture of Jairam Ganpat. It didn't make sense that he's able to * * * function just fine, have no developmental history, and yet all of a sudden he is mentally retarded."[2]

The district court concluded that Ganpat "possess[ed] sufficient ability to consult with a reasonable degree of rational understanding with defense counsel, is capable of understanding the proceedings and participating in his defense." Specifically, the district court noted that:

> Defendant graduated from high school and has demonstrated the ability to obtain and maintain employment, including supervisory positions and other positions that required Defendant to be responsible independently for certain tasks, accounting for money, planning and executing delivery routes and other employment related duties. Defendant has maintained a bank account and has obtained and maintained a driver's license.

On March 6, 2006, a contested omnibus hearing was held to address Ganpat's motion to suppress statements made to police because they were "obtained without a knowing, intelligent and voluntary waiver of [his] rights and after [he] had invoked his right to remain silent." The district court found that Ganpat's refusal to talk was equivocal because Ganpat's initial refusal was explained on the basis that Ganpat did not feel well and Ganpat told detectives that he "would like to speak to someone when he was feeling better." The district court concluded that Ganpat did not unambiguously or unequivocally invoke his right to remain silent and denied the motion.

---

**2.** Dr. Bruggemeyer cited a number of examples that would suggest that Ganpat was not having adaptive difficulties. She testified that as a courier Ganpat carried a Nextel phone and would read the messages, get the address, enter the address into a global positioning device and then follow the directions to where he needed to go; as a cashier, he handled money and said that his till never came up short; as a delivery person, he handled money and indicated that he did not have any trouble dealing with the cash or dividing up the tips; he was a licensed driver and was required to drive for a number of his jobs; and he often helped the victim with her routine duties as a landlord—i.e., cleaning, checking in tenants, helping to collect rent.

## I.

■ A criminal defendant is incompetent to stand trial if the defendant (1) " 'lacks sufficient ability to consult with a reasonable degree of rational understanding with defense counsel' " or (2) " 'is mentally ill or mentally deficient so as to be incapable of understanding the proceedings or participating in the defense.' " *Shoen v. State*, 648 N.W.2d 228, 231 (Minn. 2002) (quoting Minn. R.Crim. P. 20.01, subd. 1). The state must show the defendant's competence by a fair preponderance of the evidence. Minn. R.Crim. P. 20.01, subd. 3(6); *State v. Mills*, 562 N.W.2d 276, 281 (Minn.1997). We independently review the record to determine if the district court gave "proper weight" to the evidence produced and if "its finding of competency is adequately supported by the record." *See Mills*, 562 N.W.2d at 283.

Ganpat argues that the district court incorrectly concluded that Ganpat was malingering as to his mental illness and intellectual functioning, and placed too little weight on the evidence that Ganpat was unable to consult with counsel about preparing a defense. Ganpat disputes the first prong, claiming that he lacked sufficient ability to consult with defense counsel.

The district court's findings specifically adopted Dr. Nelson's conclusion that Ganpat "has sufficient present capacity to consult with his attorney with a reasonable degree of rational understanding." The district court's findings were supported by the opinions of Drs. Nelson and Bruggemeyer. Further, even Dr. Marston's opin-

ion, that Ganpat is not competent to stand trial, was equivocal. Dr. Marston opined that Ganpat was in "the ballpark for mentally retarded people who are judged to be competent" with respect to his understanding of basic legal concepts, below the average of mentally retarded people who are judged to be competent in skills to assist defense, and scored 10 out of a possible 10 on a test subpart designed to evaluate the ability of a mentally retarded person to understand case events.

Ganpat's reliance on *State v. Bauer*, 310 Minn. 103, 245 N.W.2d 848 (1976), is misplaced.[3] In *Bauer*, we held that there was sufficient evidence that the defendant may be incompetent to stand trial to require the district court to conduct further inquiry. *Id.* at 121–22, 245 N.W.2d at 858. Here, the district court did conduct further inquiry, a competency hearing in which three doctors testified.

We conclude that the district court gave proper weight to the evidence produced and correctly found that Ganpat was competent to stand trial.

## II.

■ Once a suspect is in custody, police must advise a suspect of his or her Fifth and Fourteenth Amendment rights to remain silent. *See Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A suspect may waive those rights, but that waiver must be knowingly, intelligently, and voluntarily given. *State v. Jones*, 566 N.W.2d 317, 322 (Minn.1997) (citing *Colorado v. Connelly*,

---

3. Ganpat's reliance on *Shoen v. State* and *State v. Mills* is also misplaced. In *Shoen*, we concluded that the postconviction court's findings relating to the defendant's competency to stand trial were not clearly erroneous. 648 N.W.2d at 231. Those findings included that Shoen had the ability to function, analyze, or respond appropriately to questions, and his testimony was rational, responsive, coherent, and consistent with the facts presented. *Id.* at 230. In *Mills*, we relied on the fact that the defendant had a good relationship with her attorney, was able to make key decisions regarding her defense, and did not engage in disruptive or inappropriate behavior during testimony. 562 N.W.2d at 283.

479 U.S. 157, 163–67, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). Whether a suspect has made a knowing, intelligent, and voluntary waiver of the right to remain silent and whether the suspect's statements to police were voluntarily made, are two separate issues. *See State v. Williams,* 535 N.W.2d 277, 287 (Minn.1995).

 When a suspect unambiguously and unequivocally invokes the right to remain silent, custodial interrogation must cease. *Id.* at 285. We review the factual issue of whether a suspect unequivocally and unambiguously invoked the right to remain silent for clear error. *See State v. Hannon,* 636 N.W.2d 796, 804 (Minn.2001). The "proper inquiry is whether the suspect articulated his desire to remain silent sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be an invocation of the right to remain silent." *State v. Day,* 619 N.W.2d 745, 749 (Minn.2000). Ganpat argues that he unequivocally and unambiguously invoked his right to remain silent when he indicated that he did not want to talk because he was not feeling well.

Our review of all four interviews leads us to conclude that the district court gave proper weight to the evidence and correctly concluded that Ganpat did not invoke his right to remain silent.

In the first interview by Detectives Bolluyt and Gunderson, Ganpat acknowledged understanding his *Miranda* rights and said he did not want to talk "right now," explaining "[c]ause I'm not feeling well right now." Ganpat's response was ambig-

uous and equivocal.[4] Further, the detectives' continuing questions of Ganpat did not relate to the facts surrounding the murder, but were narrowly focused on Ganpat's health, medications, and ability to talk at a later time. When asked if he wanted to talk to the detectives at a later time or never talk to them, Ganpat said that he did want to talk to the detectives if he felt better.

Ten hours later that same day, Detectives Bolluyt and Gunderson returned to speak with Ganpat a second time. Although the detectives did not read Ganpat his *Miranda* rights at the beginning of this second interview, we have said that a second *Miranda* warning is not always necessary. *See State v. Andrews,* 388 N.W.2d 723, 729 (Minn.1986). Although Ganpat said that he did not want to talk during this second interview because he still was not feeling well, Ganpat did not say that he did not want to talk when he felt better. Also, Ganpat did not make any statements about the facts surrounding the murder during this interview.

A half hour later, Bolluyt returned to speak with Ganpat a third time, asking the following question:

> So what I'm saying is that I respect that if you're not feeling well you don't wanna talk to me right now. But what I'm saying is tomorrow morning when you wake up, I'm not gonna be here. * * * If tomorrow morning or the next day, couple days from now, if you are feeling

---

4. *See, e.g., State v. Fletcher,* 348 N.C. 292, 500 S.E.2d 668, 676–77 (1998) (holding that defendant did not invoke his right to remain silent when he indicated that he would show the detectives where he had thrown some purses after he had gotten some sleep); *Gribble v. Johnson,* 8 F.Supp.2d 942, 949 (S.D.Tex.1998) (accepting the trial court's determination that "Can we stop for just a sec- ond?" was not a request to terminate the interview or remain silent but was a request to momentarily stop because the defendant was feeling ill); *State v. Sabetta,* 680 A.2d 927, 930–32 (R.I.1996) (holding that defendant's statement that "I don't want to talk about it right now," only expressed an intent to remain silent at that moment).

better, do you want the opportunity to talk to somebody?

Ganpat answered "[y]es." Before leaving, Bolluyt read Ganpat his *Miranda* rights for the second time.

Seven days later, Bolluyt met with Ganpat shortly after Ganpat had arrived in Minnesota. Bolluyt did not repeat the *Miranda* warning, but discussed Ganpat's stay in Texas, and indicated that the purpose for the detective's visit was to do "some follow up." Bolluyt discussed the evidence he had uncovered through his investigation. He also made comments that would appeal to Ganpat's emotions— i.e., "Jay, my guess is that you were coming back to do the right thing for your family and for you, for your boys"; "I wanna be able to give you the chance for some closure"; and indicated that it was an opportunity to tell his side of the story. After these comments were made, Ganpat said "I don't really know what happened that night. I do remember wak[ing] up in the morning and see[ing] her lying down there." Shortly thereafter, Bolluyt again read Ganpat his *Miranda* rights and Ganpat said he understood them. Bolluyt asked whether Ganpat, having the *Miranda* rights in mind, wanted to talk to Bolluyt and Ganpat said, "Can we do this tomorrow?"

A reasonable officer in the same circumstances would not have understood that statement—"Can we do this tomorrow?"—to be an invocation of the right to remain silent. To the contrary, Ganpat restated that he understood his rights and then continued to answer Bolluyt's questions without any suggestion that he was not feeling well, that he did not want to speak with Bolluyt, or that he wanted counsel.

We conclude that the district court did not commit clear error when it determined that Ganpat did not invoke his right to remain silent.

## III.

 The state has the burden to prove by a preponderance of the evidence that a defendant knowingly, intelligently, and voluntarily waived his right to remain silent. *State v. Linder,* 268 N.W.2d 734, 735 (Minn.1978). The state is deemed to have met its burden if it can show that the *Miranda* warnings were given, the defendant stated he understood those warnings, and the defendant gave a statement. *Id.*

 We will not reverse the district court's findings that the defendant gave a knowing, intelligent, and voluntary waiver of the right to remain silent unless "that finding is clearly erroneous." *State v. Camacho,* 561 N.W.2d 160, 168 (Minn.1997). But, "[w]hen an appellant contends that credible evidence supports a contrary finding," we "will make a subjective factual inquiry to determine whether under the totality of the circumstances the waiver was valid." *Id.* at 169.

Ganpat argues that he did not voluntarily waive his right to remain silent because: (1) he was not given his medications as requested; (2) he had no prior experience with the criminal justice system; (3) he is intellectually low functioning; (4) the warnings were inadequate; and (5) the interrogation was coercive.

Ganpat admits that he was not deprived of physical comforts, and the detectives repeatedly asked Ganpat if he wanted to speak with his family. Although Ganpat alleges that he is mentally and intellectually low functioning, there was ample evidence to conclude that Ganpat was falsifying his mental and intellectual functioning. Further, a low I.Q. is not conclusive on the issue of voluntariness. *See Camacho,* 561 N.W.2d at 170. Ganpat was 38 years old; was born in Guyana, South America; was educated at English-speaking schools;

graduated from high school; and moved to the United States at the age of 18 and has lived here for about 20 years. Ganpat was previously married and has two children. He is a licensed driver, has held many different jobs, including supervisory positions, and has maintained a bank account.

Ganpat argues that the *Miranda* warnings were inadequate because, in the fourth interview, he did make some statements before the *Miranda* warning was again given, and it had been about seven days since he was last read the *Miranda* warning. But the *Miranda* warning need not necessarily be repeated in every successive interview.

In *Andrews*, police interviewed the suspect twice. 388 N.W.2d at 729. The suspect was advised of his *Miranda* rights at the beginning of the first interview, but about six hours later when police interviewed him for a second time, the suspect was not advised of his *Miranda* rights and was not reminded of the earlier *Miranda* advisory. *Id.* We held that, under the totality of the circumstances—where the suspect was questioned both times by the same officer, the earlier *Miranda* advisory was careful and comprehensive, the suspect was aware of the seriousness of the situation, and the suspect testified that it was his own decision to tell his version of the incident to the police—the *Miranda* warnings were adequate and the suspect knowingly and intelligently waived those rights and voluntarily confessed to the crime. *Id.* at 731–32.

Here, the unwarned statement on February 28 was taken by the same detective who had previously advised Ganpat of his *Miranda* rights on two occasions. The detective testified that Ganpat did not start talking about the victim's death until about five or six minutes into the interview when Ganpat stated, without any question being asked, "I don't really know what happened that night. I do remember wak[ing] up in the morning and see[ing] her lying down there." The detective assured Ganpat that if there was something Ganpat could not remember or something that he did not want to talk about, he could just say, "I don't remember." The detective then repeated the *Miranda* warning before any substantive questions were asked.

We conclude that the decision of the district court that Ganpat waived his right to remain silent was not clearly erroneous. Although the better practice is to repeat the *Miranda* warning at the beginning of each interrogation, especially after a seven-day gap in interrogation, it was unclear whether Ganpat was ready to talk during this fourth interview. Bolluyt spent the first several minutes of the interview trying to determine whether Ganpat was ready to talk. Ganpat then volunteered the first information about his presence in the home without any specific question. Bolluyt repeated the *Miranda* warning after it became clear that Ganpat was ready to talk. There is no indication that Bolluyt delayed the *Miranda* warning in order to first obtain unwarned statements which he could have repeated after the *Miranda* warning was given.[5] Under the totality of these circumstances, the *Miranda* warning was adequate.

---

**5.** These circumstances do not raise the concerns that we expressed in *State v. Bailey*, where a suspect is "apprehended under coercive circumstances, is subjected to lengthy custodial interrogation before being given a *Miranda* warning, does not have the benefit of a significant pause in the interrogation after the *Miranda* warning is given, and essentially repeats the same inculpatory statements after the *Miranda* warning as before." 677 N.W.2d 380, 392 (Minn.2004).

## IV.

The state has the burden of proving that by a preponderance of the evidence Ganpat's statements were voluntarily made. *Jones,* 566 N.W.2d at 326. We review the voluntariness of a confession de novo as a question of law. *State v. Ritt,* 599 N.W.2d 802, 808 (Minn.1999). "The test of voluntariness is whether the actions of the police, together with other circumstances surrounding the interrogation 'were so coercive, so manipulative, so overpowering that [the defendant] was deprived of his ability to make an unconstrained and wholly autonomous decision to speak as he did.'" *Jones,* 566 N.W.2d at 326 (quoting *State v. Pilcher,* 472 N.W.2d 327, 333 (Minn.1991) (alteration in original)).

Bolluyt's use of techniques that appealed to Ganpat's emotions and sympathies did not rise to the level of being "so coercive, so manipulative, [or] so overpowering" that Ganpat was deprived of his right to remain silent. Rather, the interrogation techniques were similar to those used in other cases where we have held that the statements were not coerced.

In *Pilcher,* we held that interrogation techniques that included a "sympathetic approach" did not result in an involuntary statement:

> While an emotionally distressed defendant should be allowed to become composed before making a confession, this concern arises where an accused's emotional state threatens the accused's ability to freely and voluntarily make inculpatory statements. [The accused's] emotional breakdown does not detract from the coherence and responsiveness he displayed throughout the interrogation where, despite his "emotional breakdown," [the accused] repeated the fiction of there being a "big Mexican guy" in the car. That he adhered to this woven tapestry of lies shows that [the accused's] will was not overborne.

472 N.W.2d at 334 (citations omitted).[6]

In the present case, there was no indication that police had influence over what could happen to Ganpat—i.e., that Ganpat could be charged with a lesser offense if he confessed. The detectives did not make implied or actual promises to Ganpat. Ganpat was questioned for only two hours, not an excessive length of time.[7] Ganpat was not subject to any physical deprivations. Ganpat was repeatedly asked if he wanted to speak with family members and there was no indication that Ganpat was fearful of the detectives. And Ganpat repeatedly denied that he had killed the victim. We conclude that Ganpat voluntarily made statements to Bolluyt.

Accordingly, we hold that the district court did not err when it denied Ganpat's motion to suppress the evidence of his statements to Bolluyt.

Affirmed.

---

6. *See also State v. Thaggard,* 527 N.W.2d 804, 807–12 (Minn.1995) (disapproving of police officer's promise that defendant would probably be given drug treatment if he confessed "up front," but holding that the resulting confession was voluntary because the defendant understood the *Miranda* warnings; had prior experience with the criminal justice system; was interrogated for a relatively short period of time; was interrogated by only one officer; was permitted to take a break and use the bathroom; and was not intoxicated, threatened, or intimidated).

7. *Cf. State v. Riley,* 568 N.W.2d 518, 525–26 (Minn.1997) (held that defendant's will was not overborne where the interrogation took place in the middle of the night and lasted two hours, and where defendant was not deprived of his physical needs and continually denied committing the crime).